NORTH WEST CRUISESHIP ASSOCIATION OF ALASKA, INC., Alaska Hotel and Lodging Association, Inc., Alaska Steamship Association, Inc., Alaska Travel Adventures, Inc., Alaska Travel Industry Association, Inc., Chilkat River Adventures, Inc., Chilkoot Gardens, Inc., Cruise Line Agencies of Alaska, LLC, Robert Carlin Donahue, Jr., Greater Sitka Chamber of Commerce, Inc., Ketchikan Visitors Bureau, Inc., Mahay's Riverboat Service, Inc., Resource Development Council for Alaska, Inc., Seibu Alaska, Inc., and Skagway Street Car Company, Inc., Appellants,

v.

STATE of Alaska, OFFICE OF LIEUTENANT GOVERNOR, DIVISION OF ELECTIONS, Appellee.

No. S–12232.

Supreme Court of Alaska.

Oct. 13, 2006.

**69.** *Id.* at 244.

**70.** *Id.* (quoting *Usibelli Coal Mine, Inc. v. State, Dep't of Natural Res.*, 921 P.2d 1134, 1149 n. 24 (Alaska 1996)).

Jeffrey M. Feldman and R. Scott Taylor, Feldman Orlansky & Sanders, Anchorage, and Susan A. Burke, Gross & Burke PC, Juneau, for Appellants.

Sarah J. Felix, Assistant Attorney General, and David M. Márquez, Attorney General, Juneau, for Appellee.

Layla·A. Hughes, Earthjustice, Juneau, for Amici Curiae Alaska Center for the Environment, Alaska Community Action on Toxics, Alaska Public Interest Research Group, Cook Inlet Keeper, Northern Alaska Environmental Center, and Responsible Cruising in Alaska.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

This appeal arises out of a dispute over whether the sponsors of an initiative petition secured sufficient signatures to allow the initiative to be placed on the August 2006 ballot. The initiative is sponsored by a group called Responsible Cruising in Alaska (RCA) and is aimed at imposing additional taxes and a number of new operational and regulatory requirements on the cruise ship industry.[1] The initiative was given the designation 03CTAX.

To support the placement of the initiative on the ballot, RCA was required to gather a minimum of 23,286 signatures from qualified voters in at least twenty-seven election districts by October 19, 2004. The lieutenant governor, assisted by the Division of Elections (Division), verified the submitted signatures on October 19, 2004 and ultimately determined that RCA had exceeded the number of signatures required to support the initiative by 138 votes.[2] The lieutenant governor therefore directed that the initiative be placed on the 2006 statewide primary election ballot.

On January 18, 2005, North West Cruise-Ship Association of Alaska and fourteen other organizations and individuals (North West) filed a complaint requesting a declaratory judgment that the lieutenant governor and the Division of Elections had not verified the signatures in accord with statutes and regulations and seeking an injunction against placement of 03CTAX on the ballot. North West subsequently filed a motion for summary judgment, and the Division filed a cross-motion for summary judgment. The superior court concluded that the Division had substantially complied with the statutes and regulations governing the process used to verify whether the signatures submitted were those of qualified voters and granted summary judgment to the Division.

Because the issues raised in this case required expedited resolution due to the deadlines for printing the ballots in advance of the August 2006 election, we issued an order on May 11, 2006, affirming the superior court's decision granting summary judgment to the State, with a written opinion to follow.[3] This

---

1. The initiative includes an excise tax on commercial passenger vessels providing overnight accommodations in state marine waters; a tax on shipboard gambling; a change in the calculation of Alaska Net Income Tax to be based on worldwide as opposed to domestic income; a requirement that cruise ships secure marine discharge permits and report information about discharges; and authorization for private citizens to enforce marine discharge statutes and permits.

2. Originally, the lieutenant governor accepted 174 signatures in excess of the minimum required, but during the trial below the State conceded that a number of those had been improperly counted.

3. The Order provided:

Based on the expedited nature of this appeal and the upcoming deadline for ballot preparation, the following order is issued at this time,

opinion sets out our reasons for affirming the superior court.

Because we agree with Superior Court Judge William F. Morse's conclusions on each of the issues raised on appeal, we adopt the superior court's order of February 9, 2006, attached as Appendix A, to the extent consistent with our opinion.[4] But due to their importance, we briefly address below several of the issues raised by North West.

## II. STANDARD OF REVIEW

The interpretation of constitutional and statutory provisions presents questions of law that we subject to our independent review.[5] In applying the independent judgment standard, we adopt "the rule of law that is most persuasive in light of precedent, reason, and policy." [6]

## III. DISCUSSION

North West attacked the validity of the submitted signatures on four grounds. In its first challenge, North West argues that

it was improper for the Division to certify 1,202 signatures of persons whose status as registered voters at the time they signed the petition booklets was unknown. Under both the Alaska Constitution [7] and AS 15.45.120,[8] a person must be a qualified voter at the time he or she signs a petition. The Division interprets "qualified voter" to mean "registered voter." [9] The petition booklets in this case were prepared by the Division and did not include a space for a date by each signature.[10] As a result, the Division staff accepted signatures from persons who were "listed on the voter registration rolls as registered voters as of the date that the circulator certified the petition booklet."

Although the Division's method of auditing the signatures may have been somewhat imprecise, in that a subscriber's voting registration status could only be verified as of the date the petitions were filed, the audit was nevertheless reasonable given that there was no statutory requirement that each signature

with a written opinion explaining the court's reasoning to follow at a later date.

> It is ordered that the February 6, 2006 decision of the superior court, granting summary judgment in favor of the State of Alaska, Division of Elections, and denying the summary judgment motions of appellants North West CruiseShip Association of Alaska Inc. et al., is affirmed.

4. We have edited the superior court's decision to conform to our technical rules.

5. *State v. Trust the People,* 113 P.3d 613, 619 (Alaska 2005); *Paxton v. Gavlak,* 100 P.3d 7, 10 (Alaska 2004).

6. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

7. Alaska Const. art. XI, § 3, "Petition," provides:

> After certification of the application, a petition containing a summary of the subject matter shall be prepared by the lieutenant governor for circulation by the sponsors. If signed by qualified voters who are equal in number to at least ten percent of those who voted in the preceding general election, who are resident in at least three-fourths of the house districts of the State, and who, in each of those house districts, are equal in number to at least seven percent of those who voted in the preceding

general election in the house district, it may be filed with the lieutenant governor.

8. At the time this case was filed, AS 15.45.120 provided:

> Any qualified voter may subscribe to the petition by signing the voter's name and address. A person who has signed the initiative petition may withdraw the person's name only by giving written notice to the lieutenant governor before the date the petition is filed.

9. The amicus, Earthjustice, acting as attorney for various environmental and public interest groups, argues that Alaska law does not require a subscriber to an initiative petition to be a registered voter. We disagree. The term "qualified voter" is used in both the election and initiative provisions of the Alaska Constitution. Article V, section 1 of the Alaska Constitution establishes that a "qualified voter" must be a United States citizen, at least eighteen years of age, and satisfy "registration residency requirements which may be prescribed by law." The legislature has duly prescribed that a person must be registered to be qualified to vote. AS 15.05.010(4). And it stands to reason that a person subscribing to an initiative petition should also be qualified to vote on the initiative were it to be placed on the ballot. Therefore, the amicus argument is rejected.

10. The Division had not included a space for a date by the signatures in any of the initiative petitions it prepared for the last seventeen years.

be dated at the time of the audit.[11] Our analysis would be different had the legislature affirmatively required the signatures to be individually dated. But here there is no question that the Division fully complied with what the statutes and its own regulations required at the time. We further note that the petition booklets were prepared with several safeguards, including (1) a warning that anyone who signs the petition knowing that he or she is not a qualified voter is guilty of a misdemeanor; (2) directions to the petition circulators that each subscriber must be a registered Alaskan voter; and (3) a certification affidavit from the petition circulator attesting, under penalty of perjury, that the signatures in each petition booklet were drawn from persons "who were qualified voters on the date of the signature." The training materials provided to petition circulators also emphasized that the subscribers must be registered voters. Given these additional safeguards, we conclude that the 1,202 signatures were properly counted.

■ Second, North West challenges 233 of the 254 submitted petition booklets because the booklets were self-certified by their circulators. Alaska Statute 15.45.130 requires that circulators certify by an affidavit that they have complied with the statutory requirements governing the collection of signatures. Alaska Statute 09.63.020(a) allows self-certification when a notary or other official authorized to administer an oath is "unavailable." But the statute also requires that the circulator attempting to self-certify must provide a place of execution.[12] The petition booklets contained a space for the affidavit to be notarized and also allowed the circulator to self-certify but neglected to provide a space for place of execution. North West therefore argues that these booklets should be rejected for two reasons: (1) because none of the self-certifications provided a place of execution; and (2) because the booklets submitted by circulators residing in Anchorage were self-certified rather than notarized despite the fact that many notaries and other qualified officials work or reside in Anchorage.

■ Neglecting to include the place of execution in a self-certification is a technical violation of AS 09.63.020(a). But the purpose of certification is to require circulators to swear to the truthfulness of their affidavits. That purpose is readily achieved by requiring the circulators to swear that they had stated the truth by signing *under penalty of perjury*. The failure to write in the name of the place of execution does not reduce the force of that assertion. Furthermore, as we have previously noted, we liberally construe the requirements pertaining to the people's right to use the initiative process so that "the people [are] permitted to vote and express their will on the proposed legislation."[13] We therefore resolve doubts as to technical deficiencies or failure to comply with the exact procedural requirements "in favor of the accomplishment of that purpose."[14] Because the failure to provide a place of execution is a technical deficiency that does not impede the purpose of the certification requirement, we

---

11. AS 15.45.090 has since been amended, effective September 22, 2005, to require that a space for a date be provided by each signature. Ch. 2, § 33, FSSLA 2005. The amendments are not retroactive. Ch. 2, §§ 62, 63, FSSLA 2005.

12. AS 09.63.020 provides:

(a) A matter required or authorized to be supported, evidenced, established, or proven by the sworn statement, declaration, verification, certificate, oath, or affidavit, in writing of the person making it (other than a deposition, an acknowledgment, an oath of office, or an oath required to be taken before a specified official other than a notary public) may be supported, evidenced, established, or proven by the person certifying in writing "under penalty of perjury" that the matter is true. The certification shall state the date and *place of*

*execution*, the fact that a notary public or other official empowered to administer oaths is unavailable, and the following:

"I certify under penalty of perjury that the foregoing is true."

(b) A person who makes a false sworn certification which the person does not believe to be true under penalty of perjury is guilty of perjury.

(Emphasis added.)

13. *Boucher v. Engstrom*, 528 P.2d 456, 462 (Alaska 1974) (quoting *Cope v. Toronto*, 8 Utah 2d 255, 332 P.2d 977, 979 (1958)), *overruled on other grounds by McAlpine v. Univ. of Alaska*, 762 P.2d 81 (Alaska 1988).

14. *Id.; see also Municipality of Anchorage v. Frohne*, 568 P.2d 3, 8 (Alaska 1977).

conclude that the petition booklets should not be rejected on these grounds.

■ North West's second contention concerning the self-certifications—that it cannot possibly be true that notaries were "unavailable" to the circulators residing in Anchorage and that therefore the self-certified petitions should be disqualified—essentially requires that we read the word "unavailable" in AS 09.63.020(a) to mean that self-certification is not allowed if a notary or other official authorized to take an oath is present in a circulator's hometown or larger community. But the petition form contained no definition of "unavailable" or instructions regarding the determination of a notary's unavailability under the statute. Furthermore, the language of AS 09.63.020 does not establish a presumption that if a community includes a notary, that notary is "available." As the statute includes no language suggesting that the term "unavailable" be interpreted in a restrictive manner, we decline to do so here. And, again, the fact that the circulators signed the self-certifications under penalty of perjury provides a safeguard. We therefore conclude that the self-certified petition booklets were properly accepted by the Division.

■ Third, North West challenges all of the signatures contained in two petition booklets because one page in each booklet failed to include the "paid by" information required by statute. Former AS 15.45.090(5) required that the name of the person or organization that has agreed to pay the circulator be included on each page of a petition booklet. Pursuant to the form of AS 15.45.130(8) in effect at that time, the circulator must attest that he or she placed this information in bold capital letters in the space provided before the circulation of the booklet.[15] The regulation implementing the statute, 6 AAC 25.240(g)(2), provides that the signatures contained in a petition booklet will not be counted if the "circulator did not complete the information on *each* signature page as required by AS 15.45.130(8)." (Emphasis added.) In sum, the Division's own regulations bar it from counting any of the signatures in an entire petition booklet that failed to provide the "paid by" information on each and every page. But in this case, two booklets each contained a single page that lacked the required information. Instead of disqualifying all signatures from each booklet, the Division only disqualified the signatures from the pages that lacked the "paid by" information and counted the remaining signatures on the pages that contained the required information.

We conclude that the Division construed its own regulations in a manner that struck a careful balance between the people's right to enact legislation by initiative and the regulations requiring that potential petition subscribers be made aware that the circulators may have a motivation to induce them to sign the petition other than a personal belief in the value of the initiative. Those signatures from persons who were clearly unaware that the circulator was or was not being paid were correctly discarded, but those signatures from persons who had been made aware of the issue were properly retained. The Division's construction of its own regulations is therefore in line with our directive in *Fischer v. Stout* to seek "a construction ... which avoids the wholesale dis[en]franchisement of qualified electors."[16] Again in light of the fact that we have adopted a rule of liberal construction with regard to statutory initiative procedures,[17] we conclude that counting the signatures from the pages containing the proper "paid by" information reflects the balance sought by the legislature between the people's right to legislate by initiative and the goal of ensuring that petition subscribers are well-informed upon signing.

■ Finally, North West challenges two groups of signatures from persons who did not provide a physical residence address. At that time, AS 15.45.120 provided that "[a]ny qualified voter may subscribe to a petition by signing the voter's name." The Division implemented this statute by requiring that each subscriber provide a physical residence ad-

---

**15.** AS 15.45.130, like AS 15.45.090, has been amended effective September 22, 2005. Ch. 2, § 36, FSSLA 2005.

**16.** 741 P.2d 217, 225 (Alaska 1987).

**17.** *Boucher,* 528 P.2d at 462.

dress.[18]   In this case, 4,001 subscribers did not provide a physical residence address but rather provided a mailing address in the form of a post office box number, rural box number, or general delivery location.   Another sixty-five subscribers provided either no address or only partial address information, but all sixty-five provided another identifier such as a voter registration number or social security number.   As a result, North West argues, neither group of signatures was properly counted.

The purpose of the address information is to provide sufficient information to verify that the subscribers were registered voters. The Division explained that it does not discount a signature for failure to provide a physical residence address when the signer provides a mailing address that is sufficient to verify the validity of the signature.   The Division also explained that it interprets 6 AAC 25.240(h)(1) [19] to mean that a subscription lacking an address or containing a partially complete address may be accepted if the subscriber provides an identifier such as date of birth, voter number, or social security number with which to verify the subscriber's identity as a registered voter.   Those subscribers who voluntarily provided another identifier such as a social security number or voter number certainly provided enough information to verify whether they were registered voters in Alaska at the time of signature.   Because all of these subscribers provided information sufficient to verify their status as registered voters, we once again conclude that the Division has the discretion to interpret the statute and its own regulations in a manner that furthers the right to legislate by initiative, and we affirm the superior court's conclusion that both groups of signatures were properly counted.

## IV.   CONCLUSION

For these reasons and those discussed in Judge Morse's attached order, we AFFIRM the grant of summary judgment to the Division and the denial of summary judgment to North West.

### Appendix A

### IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

### *ORDER* [1]

**Plaintiffs' Motion for Summary Judgment State's Motion for Summary Judgment**

### Introduction.

In 2003 the lieutenant governor certified the application of a group calling itself Responsible Cruising in Alaska (hereafter "sponsors") for an initiative that would enact a measure imposing certain taxes and other requirements on cruise ships that bring tourists to Alaska.   The lieutenant governor notified the sponsors that they would need at least 23,286 signatures from qualified voters. By October 19, 2004 the sponsors gathered a total of 27,877 signatures.   The Division of Elections assisted the lieutenant governor in determining that 4,417 signatures should be rejected for various reasons.   Ultimately, the lieutenant governor found that the sponsors had collected 23,460 valid signatures, 174 more than was required.   He directed that the initiative be placed on the 2006 statewide primary election.

Plaintiffs are organizations and individuals who claim to be harmed by what they allege was the lieutenant governor's wrongful determination that the sponsors collected sufficient signatures from qualified voters.   They

---

**18.**   6 AAC 25.240(b) provides:

Each subscriber to the petition shall provide the subscriber's printed name, *physical residence address* and city, and signature or mark. The subscriber's voter's registration number or social security number will be requested for identification purposes;  however, provision of this information is optional.
(Emphasis added.)

**19.**   6 AAC 25.240 provides:

(h) An individual signature in a petition booklet will not be counted in determining the sufficiency of the petition if the signer
    (1) provides an address that is not the signer's current address in the division's voter registration database and the signer does not provide an identifier[.]

**1.**   This Order has been edited to comply with the technical rules of the Alaska Supreme Court, and most internal citations have been omitted.

filed suit seeking a ruling that the sponsors had submitted insufficient valid signatures and an injunction prohibiting the placement of the initiative on the ballot.

The State of Alaska, Division of Elections (hereafter Division), has moved for summary judgment. Its primary argument is that Plaintiffs' claims are properly understood to be challenges to the form of the petition booklets prepared by the Division. As such the Plaintiffs' lawsuit is alleged to be untimely. The Plaintiffs have opposed the Division's motion and cross-moved for summary judgment. They allege that the Division made numerous errors and should have rejected far more than an additional 174 signatures. The Division opposes that motion. Six organizations, including the sponsors, have filed an amicus brief supporting the Division.

All parties agree that there are no genuine issues of material fact that preclude summary judgment. They disagree on the legal significance of the undisputed facts. The Court will address the Division's timing and burden of proof arguments first and then turn to each of the Plaintiffs' arguments, tracking the impact on the number of valid signatures from qualified voters.

### Statute of Limitations and Laches.

Once the application is certified, the lieutenant governor prepares the petition booklets and delivers them to the sponsors.[2] Persons qualified to be circulators may then attempt to obtain the signatures of qualified voters.[3] No later than one year after notice that the petition booklets were ready for delivery, the circulators file the petition booklets so that the signatures can be examined and counted.[4] At the time of filing each circulator must certify by affidavit that certain criteria have been met.[5] The "affidavit must state in substance ... (5) that ... the signatures are of persons who were qualified voters on the date of signature."[6]

Plaintiffs reason that there is a set of signers who became qualified to vote during the period between the certification of the application and the filing of the petition booklet. They argue that because the lieutenant governor did not require that each signer provide the date of signature, there is no way to confirm that the signer was a qualified voter at the time of the signing. Some number of this set of signers could have become qualified to vote before the filing of the petition booklets, but after they signed.

Plaintiffs also challenge those petition booklets filed by any circulator who submitted the requisite affidavit with his or her own self-certified signature rather than with [a] notarized or witnessed signature.[7] A person may self-certify an affidavit when a notary or public official is not available.[8] In that case,

> [t]he certification shall state the date and place of execution, the fact that a notary public or other official empowered to administer oaths is unavailable and the following: "I certify under penalty of perjury that the foregoing is true."[9]

Plaintiffs argue that those circulators who self-authenticated their affidavits did so inappropriately, that is, when a notary public or authorized official was available. Thus, Plaintiffs argue, all of the petition booklets accompanied by self-certified affidavits should be disregarded.

Plaintiffs point out that the certification form prepared by the Division includes spaces designated for "Signature of Circulator" and "Date," but no space for the location of the execution. Presumably the missing location data would have assisted the Division in determining if a notary public or other official actually was not available to witness the circulator's signature of the affidavit. For example, Plaintiffs argue that

---

2. AS 15.45.090.

3. AS 15.45.110.

4. AS 15.45.140.

5. AS 15.45.130.

6. *Id.*

7. AS 09.63.010 lists which officials, including a notary public, can witness the signature of an affidavit.

8. AS 09.63.020.

9. AS 09.63.020(a).

there are many notaries and officials in Anchorage and other larger cities in Alaska, so any circulator in those communities should not have needed to self-certify because authorized officials were available.

Alaska Statute 15.45.240 establishes a thirty-day period within which a person who claims to have been harmed by a determination made by the lieutenant governor regarding the initiative process must bring a suit to challenge the determination. The Division argues that these two claims of Plaintiffs are properly understood to be challenges to the form of the petition booklet that the Division prepared pursuant to AS 15.45.090. The Division reasons that it could have modified the petition booklets to require a date of signature and to clarify the option of self-certification if Plaintiffs had raised these objections shortly after the Division prepared the petition booklets. Since the Plaintiffs did not bring this objection within thirty days of the lieutenant governor's distribution of the petition booklets, the current challenge is untimely.

The Division also makes a related argument of laches. It points out that representatives of some of the plaintiff organizations were aware of the layout and contents of the petition booklets when they were initially provided to the sponsors. The Division argues that a challenger with knowledge of the alleged deficiencies of the petition booklets should have raised its objection when it learned of the alleged deficiency, rather than wait over a year until after the sponsors filed their collected signatures.

Both of the Division's untimeliness arguments turn on when the alleged legal error by the lieutenant governor was made. The real genesis of the Plaintiffs' complaint was not the creation of the particular format of the petition booklet that did not have a space for a signature date or more restrictive instructions about when self-certification of the circulator's affidavit was permissible. Rather, it was the decision of the lieutenant governor to accept signatures that Plaintiffs claim should have been rejected for any number of reasons. All of the challenged decisions of the lieutenant governor and the Division prior to the determination that a sufficient number of qualified voters had signed the petition were merely preparatory and of no ultimate significance. It was the decision to place the proposition on the ballot that is the aggrievement that triggers the thirty-day period, not the preliminary decisions made concerning this petition.[10]

*The statute of limitations and laches arguments are without merit.*

**Constitutional Presumption and Burden of Proof.**

The parties disagree on which side bears the burden of proof that a signature should be counted. This question implicates the role of initiatives in Alaska.

In Alaska the voters' ability to bypass the legislature and instead enact laws by initiative is a right guaranteed by the state constitution.[11] The legislature may prescribe additional procedures for the initiative.[12] It has done so in AS 15.45.[13] In *Boucher v. Eng-*

---

10. The Court can conceive of errors in the preparation of the petition booklets that might trigger the thirty[-]day period immediately upon the release of the booklets to the sponsors. But the claims that these Plaintiffs allege cannot be transformed into the type of error that should only, or even could, be addressed shortly after the preparation of the petition. The fact that a different form of booklet, one that required the signer to date the signature, might have been helpful in determining the qualification of the signer, does not mean that a challenge to the number of valid signatures may only be made at the beginning of the circulation process. Likewise, there was no way the Plaintiffs could know of the lieutenant governor's decision to accept the self-certified affidavits of some circulators (much less that circulators were preparing their

affidavits in this manner) until the lieutenant governor announced that sufficient signatures had been collected.

11. Alaska Const. art. XI, § 4. The initiative was the subject of "a far-ranging and spirited debate" at the Constitutional Convention. *Thomas v. Bailey*, 595 P.2d 1, 3 n. 12 (Alaska 1979). There are certain topical restrictions to the use of the initiative that are not germane to this case. Alaska Const. art. XI, § 7.

12. Alaska Const. art. XI, § 6.

13. The Division assists the lieutenant governor and has promulgated its own regulations for the initiative process. *See* 6 AAC 25.240.

*strom*, the Alaska Supreme Court adopted a rule of liberal construction of statutory initiative procedures, in favor of upholding proposed initiatives:

> In reviewing an initiative prior to submission to the people, the requirements of the constitutional and statutory provisions pertaining to the use of initiatives should be liberally construed so that the people are permitted to vote and express their will on the proposed legislation ... all doubts as to technical deficiencies or failure to comply with the exact letter of procedure will be resolved in favor of the accomplishment of that purpose.[14]

Subsequently, in *Municipality of Anchorage v. Frohne,* the Alaska Supreme Court held:

> In matters of initiative and referendum, we have previously recognized that the people are exercising a power reserved to them by the constitution and the laws of the state, and that the constitutional and statutory provisions under which they proceed should be liberally construed. To that end all doubts as to technical deficiencies or failure to comply with the exact letter of procedure will be resolved in favor of the accomplishment of that purpose.[15]

Plaintiffs want the lieutenant governor to have to prove that a signature challenged by them was properly counted. The Division wants the Court to adopt "a presumption of validity in favor of duly executed initiative petition signatures."

Plaintiffs start from the accurate statement that the lieutenant governor has a constitutional[16] and statutory[17] duty to allow an initiative on the ballot only if the legislatively prescribed number of qualified voters have signed the petition. From that duty the

Plaintiffs reason that the lieutenant governor has the burden of proving that there were sufficient signatures. Thus, if a challenger claims a particular set of signatures are invalid, it would be the lieutenant governor's burden to prove that the signatures were validly counted.

The Division disagrees. It reasons that the initiative is a constitutional mechanism reserved to the voters and that any doubts should be resolved in favor of placing an initiative on the ballot. The Division agrees that the achievement of the minimum number of signatures cannot be waived or the number reduced, but argues that once the lieutenant governor decides to count a signature, the burden of proving that the signature should not have been counted is on the challenger.

The Court concludes that the Division has the better argument. The Court interprets the general propositions of *Boucher* and *Frohne* to mean that the voters' right to enact laws by the initiative requires the Court to interpret legislative procedures in favor of the exercise of the initiative power. The lieutenant governor has the initial burden of proving that a sufficient number of signers supported the initiative. Once the lieutenant governor has done that, the burden shifts to the challengers to prove that a particular signature or set of signatures should not have been counted.[18]

**Determination of Signers' Qualification to Sign.**

In order to be eligible to sign a petition a person must be a "qualified voter."[19] When the circulator files the signed petition booklets, he or she must certify that "the signa-

---

14. 528 P.2d 456, 462 (Alaska 1974) (quotation and citations omitted), *overruled on other grounds by McAlpine v. Univ. of Alaska,* 762 P.2d 81 (Alaska 1988); *see also Thomas,* 595 P.2d at 3 ("The right of initiative and referendum, sometimes referred to as direct legislation, should be liberally construed to permit exercise of that right.").

15. 568 P.2d 3, 8 (Alaska 1977) (quotation and citation omitted).

16. *See* Alaska Const. art. XI, § 6.

17. *See* AS 15.45.150–.160.

18. *Cf. Finkelstein v. Stout,* 774 P.2d 786, 788 (Alaska 1989) ("The burden of proving ballot illegality in general and particularly that the ballot in question was not cast on or before election day is on the challenger.").

19. AS 15.45.120.

tures are of persons who were qualified voters on the date of signature." [20]

The lieutenant governor certified the application for this initiative on October 8, 2003. The Division provided the petition booklets to the sponsors on October 20, 2003. On October 19, 2004 the sponsors submitted the petition booklets to the lieutenant governor.

By checking [ ] against voter registration lists, the Division could determine whether a signer was registered to vote (and thus qualified to sign) before the first date that the petition was available for circulation (October 20, 2003). It could also determine whether a signer was not qualified because he or she only became registered to vote after the last date of circulation (October 19, 2004). This leaves a set of voters who became registered to vote during the year the petition was circulating.[21] Although the Division knows the date the signer became registered to vote within this year, it does not know when the signer actually signed because that information is not required to be indicated on the petition booklet by the signer or the circulator.

Plaintiffs reason that within the set of signers who registered to vote during the circulation year, there is a subset of signers who signed before registering. This is almost certainly true, although the number of signers within the subset is unknown.[22]

The lieutenant governor is obligated to determine whether a sufficient number of qualified voters signed the petition. Plaintiffs argue that there is no way to know how many signers who registered to vote within the circulation year had registered before signing. Given this uncertainty and the narrow margin of signers beyond the minimum needed, Plaintiffs argue the lieutenant gover-

nor could not have determined that enough qualified voters signed.

Plaintiffs make a reasonable argument. It may well be that the better mechanism would have been to require signers to date their signature so that the signer's status as a registered voter could be later confirmed. But there are other ways to determine whether a person is registered to vote at the time of signing.

The legislature decided to allow the use of one of those alternatives. It required the circulator to affy that the signer was a registered voter at the time of signing. The circulator may gather evidence of the signer's status by asking the potential signer if he or she was registered. The potential signer might give a false or mistaken affirmative answer, but the legislature apparently decided that the risk of that inaccurate answer was not too great in comparison with the difficulties associated with other means of determining the signer's status.[23]

The legislature could have required a signer to show the circulator a current voter's registration card. But some (possibly very large) number and percentage of potential signers would not have that card with them when they wanted to sign and thus could not sign (at least not then). The imposition of that requirement would burden (if not eliminate) a significant number of potential signers seeking to exercise this aspect of their right to initiate laws directly. The legislature is clearly empowered to authorize the lieutenant governor to use this less than precise means of determining the signers' registration status.

*The Division did not err in relying upon a method of gathering information from signers that results in there being only an admittedly imprecise means of determining whether a certain set of signers were registered*

---

20. AS 15.45.130(5).

21. This set contains 1,204 signers.

22. This uncertainty cuts both ways. Just as it is unclear if enough signers were timely registered so that the petition had sufficient signers, it is unclear whether enough signers should have been disqualified such that too few qualified voters signed the petition. As challengers to signers whose signatures the lieutenant governor count-

ed, the Plaintiffs have the burden of proving the number of signers within the subset.

23. Presumably to reduce the number of unqualified signers, the legislature required that the petition booklet contain a warning that a person "who signs the petition when knowingly not a qualified voter, is guilty of a class B misdemeanor." AS 15.45.100.

*voters on the date of signing. The lieutenant governor did not fail in his duty to determine that a sufficient number of qualified voters signed the petition by using this less-than-perfect method.*

### Self–Certified Affidavits of Circulators.

Plaintiffs assert that 233 of the 254 petition booklets that the Division counted were self-certified by the circulator. Plaintiffs demand that all 233 be rejected. They allege that the circulators did not meet the criteria for self-certification of their affidavits.

The election statutes do not specify how the circulators prepare their affidavits. AS 15.45.130 merely requires that each petition be "certified by an affidavit." The circulators who self-certified their affidavits used a mechanism that is expressly authorized by the statute that sets forth the means by which an affidavit may be certified. AS 09.63.020 permits self-certification if a notary public or other official is "unavailable" to take an oath, affirmation or acknowledgment. The statute does not define unavailability.

There is no suggestion in AS 09.63.020 that there is a geographical component to unavailability, say a minimum distance that the affiant must travel to get to the nearest notary or official. Nor is there any suggestion that the affiant must be willing to travel more than a minimum amount of time to get to the notary or official. Even if the Court were to graft geographic and/or temporal criteria onto the concept of unavailability, Plaintiffs have provided no evidence that the circulators did not meet those criteria. They simply suggest that surely the circulators must have been able to find a notary or official in the days before filing the petition booklets.

The Court is unwilling to assume that any single circulator or number of circulators did not properly self-certify, particularly when the forms that the Division provided to the sponsors and circulators expressly indicated that self-certification was an option and gave no description of what constituted the unavailability of a notary public or an official.[24]

*The Division did not improperly count the signatures on petition booklets submitted by circulators who certified the petition booklets by a self-certified affidavit.*

### Identification of Organization Paying the Circulators by Initials.

Supporters of a petition can pay to have circulators attempt to gather signatures.[25] When a circulator files the petition booklets to have the signatures tallied, the circulator's affidavit "must state in substance that ... if the circulator has received payment or agreed to receive payment for the collection of signatures on the petition, the name of each person or organization that has paid or agreed to pay the circulator for collection of signatures on the petition."[26] The Plaintiffs seek to have the Court prohibit the lieutenant governor from counting 2,690 signatures included on twenty-three petition booklets wherein the circulator identified the organization that had provided or would provide payment as "RCA" or "RCIA" rather than as "Responsible Cruising in Alaska."[27]

The purpose in requiring these disclosures appears to be two-fold. First, the potential signer is informed that some person or organization is actually paying the circulator to attempt to collect signatures. That information may be significant to some potential signers regardless of who is paying the circulator. The disclosures in the twenty-three

---

24. *See* Mem. in Supp. of Pl. Mot. for Summ. J., Ex. 2, at 2 ("To complete the certification affidavit: ... Have the Notary Public or other official complete the affidavit or, if no official is available, complete the self-certification portion.") and 15 (certification affidavit) (similar instructions for self-certification); *cf. Div. of Elections of State v. Johnstone,* 669 P.2d 537, 541–42 (Alaska 1983) (forfeiture of office was too harsh a remedy when the person failing to comply with an election requirement did so in part upon reliance on advice from officials involved in the judicial retention process).

25. AS 15.45.110.

26. AS 15.45.130(8). Once an application has been certified and the petition is being prepared, the lieutenant governor is required to include "sufficient space at the bottom of each page for the information required by AS 15.45.130(8)." AS 15.45.090(5).

27. All of the twenty-three booklets properly indicated that the circulator was being paid.

contested petition booklets informed the potential signers of the fact of payment.

Second, the potential signer might consider the identity of the payor to be a factor relevant to whether to sign the petition. But the usefulness of the mere name of the payor in providing information about the supporters or sponsors of the petition is problematic. For example, the full name of the payor (and also the sponsor) of this petition was "Responsible Cruising in Alaska." That name hardly gives the potential signer much information about the identity of the members of that group, much less their interests or viewpoints. But the use of that identifier satisfies the statutory requirement that the identity of the payor be disclosed on the petition booklet.

Plaintiffs argue that the use in certain booklets of the initials "RCA" or "RCIA" somehow deprived the potential signer of the minimum information about the payor that the statutory requirement intends the signer to have. But as a practical matter the initials give no more or less information than the full name of the payor group.

The potential signers had the same options regardless of whether the booklet contained the disclosure of the full name or only the initials of the payor. The potential signers could always ask the circulator for more information about the payor. Depending upon the information given orally by the circulator, if any, the persons decided whether to sign. If the person was uncomfortable with the quality of information about the individuals supporting or promoting the petition or paying for the circulator, then the potential signers could simply have declined to sign.

The Court concurs with the implicit decision of the signers of booklets that contained only the initials of the circulator's payor that the signers were not deprived of any significant information that was required to be given to them.

*The lieutenant governor did not err in counting signatures in booklets wherein the payor was identified by initials rather than its full name.*

### Lack of Required Circulator Payment Disclosure.

The lieutenant governor rejected 11 petition booklets because they did not contain any identification of the payor of the circulator.[28] Two of the petition booklets each contained a single page that did not include any identification of the payor. The lieutenant governor did not count any signatures on those two pages, but did count 272 signatures from the other pages in the two booklets.[29] Plaintiffs argue that the lieutenant governor should have rejected the signatures on all pages of those two petition booklets.

When a circulator files a petition to have the signatures tallied, the circulator's affidavit "must state in substance that ... the circulator prominently placed ... in bold capital letters, the circulator's name and, if the circulator has received payment or agreed to receive payment for the collection of signatures on the petition, the name of each person or organization that has paid or agreed to pay the circulator for collection of signatures on the petition." AS 15.45.130(8). There is no dispute that the two pages of the two booklets did not contain the requisite identification of the payor. The parties dispute the remedy.

Alaska Statute 15.45.130 states in part that "[i]n determining the sufficiency of the petition, the lieutenant governor may not count subscriptions on petitions not properly certified." Plaintiffs contend that this gives the lieutenant governor no discretion: if any page of a booklet is missing the identity of the payor, then the lieutenant governor must reject the entire booklet. They are supported in this interpretation by the Division's own regulation that provides, "[t]he signatures contained in a petition booklet ... will not be counted in determining the sufficiency

---

**28.** Page 3 of booklet 16 and page 7 of booklet 239 are the offending pages. The circulators indicated that each had been or would be paid, but left blank the section where the payor should have been identified.

**29.** Booklet no. 16 contained signatures of 151 qualified voters and booklet no. 239 contained signatures of 121 qualified voters.

of the petition if ... (2)[the] circulator did not complete the information on *each* signature page as required by AS 15.45.130(8)." [30]

The Division concedes, as it must, that it acted in contravention to its own regulation when it only rejected the signatures on the particular pages that did not contain the identity of the payor rather than the signatures in the entire booklets. But it argues that it was justified, and even required, to disregard its regulation by the constitutional principles described in *Boucher* and *Frohne*. Furthermore, the Division argues that it was guided by a recent superior court decision in *Hinterberger v. State*,[31] applying those principles to reject a practice established by another of the Division's regulations.

In *Hinterberger* the superior court reversed the lieutenant governor's decision not to count the signatures contained in petition booklets submitted by circulators who did not comply with various regulatory requirements.[32] The exact details of the supposed noncompliance are unimportant. What is important is how the Division reacted to the superior court's conclusion. The court had written:

> The right to initiative is a key feature of Alaska's governance. Our Supreme Court has reiterated on several occasions that the right to initiative is not to be defeated by technical rule violations. When strict adherence to a regulatory scheme, with exclusion of signature ballots for what may be deemed trivial rule violations, itself becomes the obstacle to a fair initiative process, our Supreme Court has drawn a clear line in favor of lenity toward the initiative proponents.[33]

The Court begins with the language of AS 15.45.130. It has two components, a list of substantive requirements imposed upon the circulator and a remedy for noncompliance. The particular substantive requirement is the indication that some payor is paying or will

pay the circulator and the identification of that payor.[34] If the circulator fails to identify the payor then the remedy is triggered: "the lieutenant governor may not count subscriptions on petitions not properly certified." [35]

Although neither party discussed this issue, the Court has to question the constitutionality of the requirement that the petition booklet contain the fact of payment and name of payor. In essence, the legislature is saying that a qualified voter cannot choose to place a proposition on the ballot unless he or she not only knows that the circulator is being paid, but knows the identity of the payor.

While many voters might well appreciate and even demand that information, many others do not care a whit. Indeed, the voters who signed on the two pages that did not contain the payor's identity apparently were not frustrated by the lack of that information. Why should the legislature insist that those voters know something the voters themselves determined they did not need to know? This information might be helpful. But can the legislature constitutionally condition a voter's right to participate in the initiative process upon receipt of specific information? Even if it can, perhaps some of the signers did know who the payor was, either because they looked on the other pages of the booklet, asked the circulator, or knew from another source of the role played by the group Responsible Cruising in Alaska.

The scope of the legislative remedy for a failure to identify the payor is unclear. What signatures did the legislature intend the lieutenant governor exclude if a page of the petition booklet did not include the payor's identity? Alaska Statute 15.45.130 instructs that the lieutenant governor "not count subscriptions on petitions not properly certified." Does that mean that if the payor's identity is left off one page of one booklet that the entire petition is invalid, even

---

**30.** 6 AAC 25.240(g) (emphasis added).

**31.** No. 3AN–03–04092 CI. (Alaska Super., October 21, 2003).

**32.** *Hinterberger*, No. 3AN–03–04092 CI.

**33.** *Id.* at 22.

**34.** AS 15.45.130(8).

**35.** AS 15.45.130.

though ten times the minimum number of signatures was submitted? That would be an absurd result and one that clearly would infringe upon the voters' right to an initiative.

Since the error that Plaintiffs challenge was likely (though not necessarily) the fault of one or more individual circulators, would it be reasonable to construe the statute to mean that if a circulator submitted a booklet that contained one faulty page that every booklet submitted and all signatures gathered by the circulator be disregarded? That too would be an absurd and unconstitutional result. The signers on the other booklets all had the requisite information. There would be no reason to preclude those signers from being counted merely because the signers of another booklet were not informed of the payor's identity.

The Division, by its regulation, interpreted the statute to mean that if any page in a single booklet was defective, then the entire booklet was disregarded. Why is that result any more reasonable than a decision to reject all of the circulator's other booklets? The signers of the other, proper pages of the booklet with the defective page had all of the requisite information, just as did the signers of the booklets that were entirely conforming.

The Court should endeavor to construe a statute to avoid absurd and unconstitutional results.[36] An aspect of the decision in *Fischer v. Stout*[37] provides some guidance. In *Fischer*, six women had attempted to vote by signing a name different from that under which they were registered.[38] There was no question that each was who she claimed to be and all were properly registered.[39] A statute allowed a voter whose name had been changed by marriage or court order to "vote under the previous name."[40] The Alaska

Supreme Court had to interpret the meaning of that statute. It observed:

Legislative history provides little guidance in interpreting the facially ambiguous phrase, "may vote under the previous name." Accordingly, we will seek a construction of the phrase which avoids the wholesale disfranchisement of qualified electors.[41]

In reaching this conclusion the court relied upon an earlier case, *Carr v. Thomas*, where it observed:

Courts are reluctant to permit a wholesale dis[en]franchisement of qualified electors through no fault of their own, and where any reasonable construction of the statute can be found which will avoid such a result, the courts should and will favor it.[42]

The voters who signed the other pages of the two booklets have a right to participate in the initiative process and should not be disenfranchised because of the error of a circulator that had no impact upon them. This Court should construe the remedial portion of AS 15.45.130 only as broadly as is necessary to address the specific error. It should avoid an interpretation that requires a broader remedy that disenfranchises voters who did nothing wrong.

Plaintiffs argue that they also have protected interests. They contend that they have the right to be exposed to an election that includes an initiative that will adversely affect them if passed only if the sponsors met the requirement that a minimum number of signers support the initiative. The Court will assume that the Plaintiffs have such a right. That right is adversely affected by the Division's decision to reject only the signatures on one page rather than those in the entire booklet in two ways. First, Plaintiffs are exposed to the possibility of having the initiative pass. But the initiative may well be defeated. If the electorate rejects the initia-

---

36. *See Chenega Corp. v. Exxon Corp.*, 991 P.2d 769, 785 (Alaska 1999) ("Where it is reasonable to do so, we will construe a statute to avoid constitutional problems.")

37. 741 P.2d 217 (Alaska 1987).

38. *Id.* at 224.

39. *Id.*

40. *Id.* at 225.

41. *Id.*

42. 586 P.2d 622, 626 (Alaska 1978) (quotation and citation omitted).

tive, then the Plaintiffs will not suffer the economic consequences that might have befallen them if it had passed. Second, the Plaintiffs argue that they will suffer from the election itself, regardless of the result, because they will have to spend time, money, and resources to advocate for the defeat of the initiative.

Balancing the adverse impact of the Division's decision on the Plaintiffs against the adverse impact upon a) the specific voters whose signatures would not be counted if the entire booklets were rejected, b) the other voters who signed the petition booklets, as well as c) the general electorate's right to engage in the initiative process, the Court concludes that far more irreparable damage would be done to the latter groups by the rejection of the entire booklets than would be done to the Plaintiffs by the rejection of the signatures on the two pages of the booklets.

To have rejected the entire booklets would very likely have been a violation of the constitutional rights of the rejected signers and the rights of the other subscribers.

The Court agrees with the Division's analysis that it is necessary to narrowly construe the remedial portion of AS 15.45.130. *The Court concludes that the Division acted reasonably in interpreting the remedial portion of AS 15.45.130 to require only the rejection of the signatures on the two pages that did not include the identity of the payor of the circulators.*[43]

### Presence of Circulator at Time of Signature.

A circulator must be physically present when the signer signs the petition booklet.[44] Plaintiffs have submitted an affidavit of Michael Winred. He affied that he observed a petition booklet (later identified as booklet no. 171) at the Eaglecrest Ski Area near Juneau. It was on a table, unattended, opened to a particular page, next to a sign that said "Please sign this." He closed the booklet and put it under a counter. He later inspected a specific page from the booklet. He affied that he recognized "the names of at least [e]ight signers on this page as ski instructors at Eaglecrest ([listing eight names])), who likely signed the petition while it was unattended on the counter in the Eaglecrest Snowsports School." The circulator affied that the signers signed booklet no. 171 in his presence. The Division counted ten of twelve signatures in booklet no. 171.[45] Plaintiffs want to exclude those ten on an inference from Winred's statement that all were signed outside of the presence of the circulator.

The Court cannot make credibility determinations on a motion for summary judgment. It assumes that Winred's description of his observations about the booklet, as well as his observations themselves, are true. However, that does not mean that the Court must (may or can) accept the inference that he draws (and upon which the Plaintiffs base their argument). To the contrary, the Court must draw all inferences in favor of the nonmoving party, that is, as to this argument, in favor of the Division.[46]

---

43. The Court need not address the question of whether the rejection of the signatures on those two pages is an infringement of the constitutional rights of those signers. Because the initiative will be on the ballot even though their signatures were not counted, those signers suffered no injury. They have attained their goal of placing the initiative on the ballot. *Perry v. State*, 429 P.2d 249, 251–52 (Alaska 1967) (holding that courts should not pass on a constitutional issue unless it is essential to the decision of a case).

44. AS 15.45.130(3) ("The affidavit must state in substance that ... the signatures were made in the circulator's actual presence.")

45. The record does not indicate why two signatures were rejected. All twelve signatures were in the booklet on one page.

46. In its motion for summary judgment the Division essentially asks the Court to reject the inferences that Winred makes. But as regards to the Division's motion, the Court must draw all inferences against the Division as the moving party. The Court could find that the inference that Winred and Plaintiffs make is simply not reasonable or does not logically necessarily follow. But that would be to stretch the Court's authority in deciding a motion for summary judgment. The Court prefers to reject the inferences of both moving parties. That does not preclude summary judgment in favor of the Division as long as the number of valid signatures is at least 23,297, eleven greater than the necessary 23,286.

*There are genuine issues of material fact concerning the circumstances in which the ten signatures counted by the Division from petition booklet no. 171 that preclude summary judgment for either the Plaintiffs or the Division. Those portions of the motions for summary judgment concerning the ten signatures on petition booklet no. 171 will be denied unless there are at least eleven valid signatures more than the minimum number needed to place the initiative on the ballot. If there are sufficient valid signatures so that the elimination of the ten disputed signatures would make no difference, then the Plaintiffs' motion will be denied and the Division's motion will be granted.*[47]

### Absence of Subscribers' Addresses.

Plaintiffs challenge two sets of signers because of the alleged failure to comply with the purported requirement that "[a]ny qualified voter may subscribe to the petition by signing the voter's name and address."[48] Plaintiffs point out that the petition booklet has a place for the signer to provide his or her residence address. The petition booklet advises the circulator that "signers must specify their residence address (where they live). In many instances the residence address differs from the mailing address." Plaintiffs allege that the Division counted sixty-five signatures by signers who gave no residence address and an additional 4,001 signatures by signers who indicated only a post office box, a rural box number, or general delivery.

Plaintiffs argue that if the signer gave anything other than a residence address, then the requirement of AS 15.45.120 has not been met and the signature should be rejected. The Division argues that the use of non-residence addresses or even the absence of

any address is still substantial compliance with the statutory requirement.

The Court does not read AS 15.45.120 as narrowly as do the Plaintiffs. It does not require that only a *physical* residence address is acceptable.[49] Nor does it even require that *residence* address be given. If some sort of address is required, then the 4,001 signers who identified their address as a post office box, a rural box number, or general delivery complied with the statute. For those persons, what each gave was his or her address. For those who gave a rural box number, that does identify, albeit indirectly, the person's residential address.

If one assumes that the failure of the sixty-five signers to provide an address fell short of what AS 15.45.120 requires, what is the proper response? The Division has interpreted the statute not to require it to disregard the signature of a signer who does not provide a physical address, or provides one different from that in the Division's voter registration database, or provides a general address, as long as the signer provides some other identifier. The Division will accept as an alternate identifier the signer's date of birth, voter number, or social security number. Every one of the sixty-five signers "provided their printed name, signature, and a confidential identifier that could be matched to their voter registration record."

The Court concludes that the Division has the discretion to interpret the requirement of AS 15.45.120 as it has done. The basic purpose of requiring the signer to provide an address is to obtain information with which the Division may determine if the signer is a qualified voter. The decision to excuse the absence of an address if some other identifier is provided by the signer so that the determination of qualification can be made is entirely

---

47. Tentatively removing the ten questioned signers of booklet no. 171 leaves 23,450 valid signatures, 164 more than needed.

48. AS 15.45.120.

49. The corresponding regulation, 6 AAC 25.240(b), requires each signer to provide his or her "printed name, physical residence address and city, and signature or mark." However, 6 AAC 25.240(h) provides:

> An individual signature in a petition booklet will not be counted in determining the sufficiency of the petition if the signer (1) provides an address that is not the signer's current address in the division's voter registration database *and* the signer does not provide an identifier.

(Emphasis added.)

reasonable and within the Division's discretion to interpret statutes.

*The Court will not exclude the set of 4,001 signers who did not provide a residence address or the set of sixty-five signers who provided no address but instead provided an alternate identifier.*

### Signers Who Were Not Registered Voters.

The Division concedes that it improperly counted two signatures by signers who were not registered voters at the time each signed.[50]

### Other Errors.

The Division concedes that it improperly counted twenty-four other signatures.[51]

### Conclusion.

The sponsors submitted at least 23,424 signatures of qualified voters.[52] This is more than the necessary 23,286 signatures. *The Plaintiffs' Motion for Summary Judgment is DENIED. The Division's Motion for Summary Judgment is GRANTED.*

**DONE** this 6th day of February 2006, at Anchorage, Alaska.

/s/ *William F. Morse*
William F. Morse
Superior Court Judge

---

**50.** This reduces the number of valid signatures from 23,450 (*see supra* note 44) to 23,448.

**51.** This reduces the number of valid signatures from 23,448 to 23,424.

**52.** This is the number of valid signatures if the ten challenged signatures from booklet no. 171 are excluded. *See supra* note 4[6] and corresponding text.