*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| LIZ VAZQUEZ, CHRIS DUKE, RANDY ELEDGE, STEVE STRAIT, and KATHRYN WERDAHL, <br><br> Appellants, <br><br> v. <br><br> STATE OF ALASKA, OFFICE OF LIEUTENANT GOVERNOR, DIVISION OF ELECTIONS, and NANCY DAHLSTROM, in an official capacity as Lieutenant Governor for the State of Alaska, and CAROL BEECHER, in an official capacity as Director of Division of Elections for the State of Alaska, <br><br> Appellees, <br><br> and <br><br> JENNIE ARMSTRONG, <br><br> Intervenor-Appellee. | Supreme Court No. S-18619 <br><br> Superior Court No. 3AN-22-09325 CI <br><br> O P I N I O N <br><br> No. 7689 – March 1, 2024 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Herman G. Walker, Judge.

Appearances: Stacey C. Stone, Richard R. Moses, and Anna E. Cometa, Holmes Weddle & Barcott, PC, Anchorage, for

Appellants. Laura Wolff, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellees. Scott M. Kendall and Samuel G. Gottstein, Cashion Gilmore & Lindemuth, Anchorage, for Intervenor-Appellee.

Before: Winfree, Chief Justice, and Carney and Henderson, Justices. [Maassen and Borghesan, Justices, not participating.]

HENDERSON, Justice.
CARNEY, Justice, dissenting.

## I.    INTRODUCTION

The losing candidate in the 2022 general election for Alaska's House District 16 and four House District 16 voters challenge the winning candidate's eligibility to serve in the legislature. To qualify as a member of the legislature under article II, section 2 of the Alaska Constitution, a candidate must have been a resident of Alaska for at least three years immediately before filing for office. For the November 2022 election, a candidate for the legislature must have been eligible on or before the June 1, 2022 filing deadline.

The winning candidate filed her candidacy on June 1, 2022, and maintains that she became an Alaska resident on May 20, 2019. The losing candidate argues that the winning candidate did not become an Alaska resident until June 7, 2019 at the earliest, thereby making her ineligible as of the filing deadline.

Applying the election-related residency statutes in Title 15, the superior court held that the winning candidate became a resident on May 20, 2019. We disagree with the court's use of Title 15 to determine state residency and hold that Title 1 governs the state residency requirement for determining eligibility of a candidate for the legislature. However, because the court did not clearly err in making factual findings that ultimately support the winning candidate's establishment of residency on May 20,

2019 under Title 1, we affirm the court's conclusion that the winning candidate is eligible to serve in the legislature.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Representative Jennifer "Jennie" Armstrong's journey to Alaska began in January 2019.  Armstrong was born and raised in Louisiana, and attended college there.  Starting sometime in 2016 she had sold most of her belongings, put a few things in storage in Louisiana, and began travelling.  Around that time, Armstrong considered herself "location independent."  On a video call with a mutual friend, she met Benjamin Kellie.  Kellie, born in Fairbanks and raised in Nikiski, had lived full time in Alaska since 2015.  During the call, which the mutual friend intended as a "set-up" for the couple, Kellie invited Armstrong to come to Alaska.

Between January and May 2019, Armstrong and Kellie maintained regular communication, and their relationship became romantic and serious.  By all accounts Kellie produced a pair of highly persuasive PowerPoint presentations convincing Armstrong to visit him in Alaska.  Kellie later testified that his plan for the visit was to "showcase" Alaska in the hope that Armstrong might relocate.  According to Kellie, he informed Armstrong during this period that he did not intend to live anywhere except Alaska.

Armstrong booked a flight and visited Kellie from May 10-20, 2019.  When she booked her flight, it was not her intent to move to Alaska.  During the visit, though, she spoke with Kellie and friends about deciding where she would choose to move and put down roots.  Both Armstrong and Kellie later testified about significant events that occurred during the visit as Armstrong began to seriously consider establishing her home in Alaska.  Both testified that on May 14 while at Chena Hot Springs, the couple had conversations about the seriousness of their relationship and its future.  Both testified that on May 18 while visiting Seward, the couple first discussed marriage and having children together.  Between May 18 and May 20 Kellie asked

Armstrong to move in with him. Both testified that sometime late on May 19 or early on May 20, Armstrong accepted Kellie's invitation to live with him in Anchorage. Armstrong testified that at that time she "was all in."

Later on May 20th — the same day she decided to reside in Alaska and make it her home — Armstrong left the state as previously planned to attend "prior commitments." Her commitments included attending a training in Washington, D.C., a friend's bachelorette party in Rhode Island, and a wedding shower in New Orleans. She later testified that when she left Alaska, her intent was to return to live with Kellie. Armstrong also claimed that immediately upon leaving she looked into a return flight. Armstrong further considered returning to Alaska between her commitments, but eventually decided it was not logistically or financially feasible. Armstrong left some personal belongings at Kellie's house for the duration of her time away. She booked her return ticket on May 25, and returned to Alaska on June 8.

Over the summer of 2019 Armstrong took several steps further demonstrating her intent to remain in Alaska and to "put down substantial, permanent roots." In July Armstrong re-licensed her business in Alaska and moved into a duplex she and Kellie renovated. In August she obtained an Alaska driver's license and registered to vote in Alaska. Since that summer Armstrong has continued to build her life in Alaska. Armstrong and Kellie purchased a home in Anchorage in September 2020. They married in October 2020. They also had a child together, have co-parented Kellie's daughter, and have served as informal guardians to two girls.

Several times since May 2019 Armstrong has posted on social media and sent text messages indicating she believed she moved to Alaska in May 2019. In August 2019 Armstrong sent a text message to a colleague indicating that she had moved her "home base" to Alaska in May, but was still "traveling a ton." In another text message dated January 2020 Kellie said that Armstrong "moved up here last May from NOLA." Both later testified that at the time the messages were sent Armstrong had no intention of running for office in Alaska. On May 14, 2020, Armstrong published a social media

post stating, "[T]his time a year ago i began an epic adventure in alaska [sic]." On May 11, 2021, Armstrong published a social media post stating, "[T]wo years ago today I landed in Alaska because Ben made a PowerPoint inviting me to road trip the state with him . . . I never left." Somewhat inconsistently, Armstrong also posted on Thursday, June 13, 2019, that "last weekend I moved to Alaska."

When Armstrong applied for two non-resident fishing permits in June 2019, she listed her childhood home in Louisiana as her permanent mailing address. Armstrong later testified she had no intent at that point to make Louisiana her home, despite listing Louisiana as her permanent mailing address. But she testified that Kellie had instilled in her how "serious" Alaska takes its fishing license residency requirements and she therefore erred "on the side of caution" by listing the Louisiana address.

Armstrong obtained annual resident sport fishing licenses in 2020, 2021, and 2022. On the 2022 license she listed her residency as one month longer than on her previous two licenses. Armstrong testified that she listed the start of her residency on the 2020 and 2021 licenses as around June 1, 2019, in "an abundance of caution" to avoid claiming extra time as a resident. On the 2022 application Armstrong testified that she claimed an additional month of residency because she had "recently determined the exact date she became a resident of Alaska."

Armstrong testified that she did not consider running for public office until May 2022. All candidates for state office must state, under oath, their length of residency in the state and district for which they are running, and certify that they "meet the specific residence and citizenship requirements of [the] office" they seek. Armstrong thereafter researched the residency requirements, stating that it was "the first time [she] had ever pinpointed [her] exact date of residency." Armstrong signed her declaration of candidacy for House District 16 on May 31, 2022, and submitted it on June 1. In her declaration Armstrong stated she had been an Alaska resident since May 20, 2019, and included a certification affirming that she provided true and complete

information and met the residency requirements of the office. The Division of Elections (Division) reviewed and approved Armstrong's candidacy. No one challenged her candidacy or eligibility at that time.

Armstrong was elected Alaska State House District 16 Representative during the 2022 General Election.[1] The Division certified her election by November 30, 2022.[2]

## B. Proceedings

Liz Vazquez, Armstrong's challenger for House District 16 in the election, and several voters in House District 16 (collectively "Vazquez") sued the Division the day the results were certified.[3] The complaint alleged that "Armstrong did not demonstrate the intent to remain in Alaska" until at the earliest, June 7, 2019. A June 7 residency date would render Armstrong ineligible to hold public office because when she declared her candidacy on June 1, 2022, she could not meet the Alaska Constitution's three-year state residency requirement. The complaint requested the court declare Liz Vazquez the winner "because she received the most votes of any legally qualified candidate." Armstrong intervened. The superior court held an evidentiary hearing in December and issued a ruling on January 9, 2023.

The superior court first determined which statutes governed the contested questions. The court looked to AS 01.10.055 as a source of general residency requirements for all persons, and to AS 15.05.020 and 15.25.043 as providing specific

---

[1] *2022 General Election Official Results Summary Report, Nov. 8, 2022*, ALASKA DIV. OF ELECTIONS (Nov. 30, 2022), https://www.elections.alaska.gov/results/22GENR/ElectionSummaryReportRPT.pdf.

[2] *Id.*

[3] The State did not seek to be dismissed from this case below or on appeal, but nonetheless asks us to consider whether the Division of Elections officials were proper defendants in Vazquez's election contest. We decline to reach this issue, as it was neither thoroughly briefed nor argued and ultimately, the State participated throughout this appeal.

guidance for determining residency for voters and candidates for public office. The court determined that only Title 15 controlled the analysis of Armstrong's residency for purposes of her eligibility to serve in the legislature. The court noted that Title 1 is "broad by design" and was meant to apply "in the construction of the laws of the state unless the construction would be inconsistent with the manifest intent of the legislature." The court further determined that AS 01.10.055 specifically allows for other "more restrictive" statutory requirements to refine the general Title 1 requirements. The court considered the Title 15 requirements to be more restrictive, and held that only Title 15 applied to the residency requirement at issue in this case. The court did not directly consider or determine whether Armstrong met the Title 1 residency requirements.

In framing its interpretation of Title 15, the superior court concluded that, under our precedent, residency is a "question of fact" and courts should consider "subjective evidence of residency that is supported by sufficient objective evidence."[4] The court, again quoting our precedent, also pointed out that courts "should accept the statements of the voter as to their intended residency if supported by sufficient indicia of residency."[5] The court further considered what qualifies as an "act of removal" under AS 15.05.020(3) to determine when Armstrong changed her residence to Alaska.[6] Citing a 1909 case from Montana for guidance,[7] the court determined that "some affirmative act, such as selecting a home, coupled with the intent to make that place a home may constitute a sufficient act of removal."

---

[4]    *Lake & Peninsula Borough Assembly v. Oberlatz*, 329 P.3d 214, 222 (Alaska 2014).

[5]    *Id.*

[6]    For a person to establish a "change of residence" under AS 15.05.020, there must be an "act of removal joined with the intent to remain in another place." AS 15.05.020(3).

[7]    *Carwile v. Jones*, 101 P. 153, 157-59 (Mont. 1909).

After outlining the legal requirements for establishing residency, the superior court evaluated whether Armstrong met them. First the court decided that Armstrong's declaration on May 20, 2019, that she intended to move in with Kellie, was an "act of removal" under AS 15.05.020(3). The court found that Armstrong's subsequent absence from Alaska from May 20 until June 8 was "temporary" and that during this time she "maintained her intent to return while she was away." The court specifically credited Armstrong's and Kellie's testimony and text messages as evidence that Armstrong's intent to live in Alaska was established as of May 20.

The superior court further decided that in determining questions of residency under our precedent, it could consider "the emotional and physical connection to one's residence." The court found that Armstrong had made an "emotional decision to make Alaska her home" because she "fell in love." It also found that her attachment to Alaska did not start when she arrived in May 2019, but instead "began after the video call" with Kellie in January 2019 and that May 20 represented only the final decision.

The court noted that Armstrong's driver's license and voting registration dates were "not dispositive of the exact date of residency." The court considered Armstrong's fishing license applications as "insufficient to support [that] she considered anywhere else other than Alaska [as home]" and credited Armstrong's testimony that despite listing Louisiana on her 2019 fishing license, she at no point intended to make Louisiana her home. As for the "length of residency" that Armstrong listed on her 2020-2022 fishing licenses, the court credited Armstrong's testimony that she was being cautious, and that she did not determine the "exact date" she became a resident until May 2022. The court ultimately found that Armstrong was credible and that there was no evidence of fraud or pretext in the dates or testimony Armstrong had provided.

The superior court fixed Armstrong's Alaska residency as beginning May 20, 2019. It therefore held that Armstrong was qualified to hold public office because she had been a resident for more than three years when she filed her declaration of

candidacy on June 1, 2022. The court upheld the Division's certification of the November 2022 election.

On January 10, 2023, one day after the superior court issued its decision, Vazquez appealed. The general legislative session was set to begin one week later on January 17.[8] We granted Vazquez's motion to expedite the appeal, reviewed the parties' briefs on an expedited schedule, and held oral argument on January 13. Following argument we issued a short order affirming the court's ultimate conclusion. We now detail our reasoning in full.

## III.   STANDARD OF REVIEW

We apply our independent judgment to questions of constitutional law, and adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[9] Statutory interpretation, including the applicability of a statute, and whether factual findings satisfy statutory requirements, are questions of law that we review de novo.[10]

We review factual findings for clear error.[11] Clear error exists when a review of the record leaves us with a definite and firm conviction that a mistake has been made.[12] Where the superior court's factual findings are based upon the court's

---

[8]     Alaska Const. art. II, § 8 (providing general legislative session convening date may be set by law); AS 24.05.090 (setting third Tuesday in January for convening general legislative session); *see* 2023 H. Journal 1 (showing January 17, 2023 as first day of general legislative session); 2023 S. Journal 1 (same).

[9]     *Gefre v. Davis Wright Tremaine, LLP*, 306 P.3d 1264, 1271 (Alaska 2013).

[10]     *See Wielechowski v. State*, 403 P.3d 1141, 1146 (Alaska 2017); *Sam M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 731, 736 (Alaska 2019).

[11]     *Lake & Peninsula Borough Assembly v. Oberlatz*, 329 P.3d 214, 221 (Alaska 2014).

[12]     *Id.*

assessment of witness credibility and its weighing of conflicting evidence, those findings receive "particular deference"; we do not reweigh evidence or make credibility determinations.[13]

## IV. DISCUSSION

### A. Constitutional And Statutory Residency Requirements Govern Whether An Alaska Legislative Candidate Is Qualified.

#### 1. The Alaska Constitution sets out three requirements for a member of the legislature.

"Our analysis of a constitutional provision begins with, and remains grounded in, the words of the provision itself."[14] We give constitutional provisions "a reasonable and practical interpretation in accordance with common sense" based on the "purpose of the provision and the intent of the framers."[15]

Article II, section 2 of the Alaska Constitution states "[a] member of the legislature shall be a qualified voter who has been a resident of Alaska for at least three years and of the district from which elected for at least one year, immediately preceding [her] filing for office."[16] This section plainly imposes three requirements for a person to serve in the legislature. The person must: (1) be a qualified voter; (2) have been a resident of Alaska for three years immediately prior to filing for office; and (3) have been a resident of the district from which elected for at least one year immediately prior to filing for office.[17]

Vazquez does not challenge Armstrong's status as a qualified voter or her residency within her house district for at least one year. Therefore, the sole issue before

---

[13]     *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011).

[14]     *State v. Alaska Legis. Council*, 515 P.3d 117, 123 (Alaska 2022) (quoting *Wielechowski*, 403 P.3d at 1146).

[15]     *Id.* (quoting *Hickel v. Cowper*, 874 P.2d 922, 926 (Alaska 1994)).

[16]     Alaska Const. art. II, § 2.

[17]     *Id.*

us is whether Armstrong established her Alaska residency for at least three years immediately prior to filing for office.

> **2.    Title 15 determines whether a person is a qualified voter and a resident of a district. Title 1 determines whether a person is an Alaska resident.**

With the three basic constitutional requirements for eligibility to serve in the legislature in mind, we look next to Alaska law for the more specific contours of these requirements. The legislature has defined both qualified voter status and residency status. Alaska Statute 01.10.055 contains a general residency definition: "[a] person establishes residency *in the state* by being physically present in the state with the intent to remain in the state indefinitely and to make a home in the state."[18] This general definition is supplanted when the legislature enacts a specific definition for a specific purpose.[19] We have noted previously that "the legislature has defined 'resident' differently for different purposes [throughout] the Alaska Statutes."[20] Relevant here, Title 15 contains residency requirements for becoming an eligible voter and for qualifying as a resident within a house district.

First, voter qualification is controlled by AS 15.05.010. To "vote at any election,"[21] a person must have "been a resident of the state and of the house district in which the person seeks to vote for at least 30 days just before the election."[22] In turn,

---

[18]    AS 01.10.055(a) (emphasis added).

[19]    *See* AS 01.10.020.

[20]    *Heller v. State, Dep't of Revenue*, 314 P.3d 69, 78-79 (Alaska 2013) (discussing different residency requirements for permanent fund dividend purposes); s*ee also, e.g.*, AS 16.05.415 (setting out residency requirements for hunting and fishing licenses); AS 14.43.125(a)(3) (setting out residency requirements for student loans).

[21]    AS 15.05.010. Several other sections address voter qualification for specific special circumstances like overseas voters or for presidential elections. *See* AS 15.05.011-.012.

[22]    AS 15.05.010(3).

the law "[f]or the purpose of determining residence for voting" is provided in AS 15.05.020, which lists eight requirements to establish residency.[23] In general, a residence is "that place in which the person's habitation is fixed, and to which, whenever absent, the person has the intention to return."[24] And as the superior court analyzed here, to change residence, there must be an "act of removal joined with the intent to remain in another place."[25]

Second, AS 15.25.043 describes how to determine whether candidates are residents of the districts they seek to represent. That statute specifically applies to "determin[e] the residence within a house district of a qualified voter for the purposes of compliance with art. II, sec. 2, Constitution of the State of Alaska."[26] Incorporating the rules contained in AS 15.05.020, the statute additionally requires a candidate to maintain a habitation at a specific location within the district, and specifies that a person loses residence by voting in another house district or state.[27]

This leaves the final constitutional requirement: a person must also have "been a resident of Alaska for at least three years" immediately before filing.[28] The superior court considered whether Title 1 applied to this determination, but ultimately ruled that "Title 15 controls the analysis for qualification of candidates." The court reasoned that AS 01.10.055 was a broad and general residency definition, and thus was supplanted by the more restrictive residency definitions found in Title 15.[29] The

---

[23] AS 15.05.020.

[24] AS 15.05.020(2).

[25] AS 15.05.020(3).

[26] AS 15.25.043.

[27] *Id.*

[28] Alaska Const. art. II, § 2.

[29] *See* AS 01.10.020 (directing that general residency definition shall control "unless the construction would be inconsistent with the manifest intent of the legislature").

**7689**

Division agreed with this interpretation. The Division further argued that Title 15 "provides a complete definition of residency for candidates." Upon a close review of the statutory language, we disagree. We hold that Title 1 provides the requirements for establishing legislative candidates' state residency under article II, section 2 of the Alaska Constitution.

Title 15 does not define how or when a person establishes residency in Alaska, because both of the residency provisions in Title 15 are limited to separate purposes. The definition in AS 15.05.020 is specifically directed toward the purpose of determining residency "*for voting*."[30] The definition in AS 15.25.043 is specifically directed toward the purpose of determining residency "*within a house district*."[31] Neither provision addresses the broader determination of residency *in Alaska*.

When interpreting statutes, we presume "that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous."[32] The actual text of AS 15.25.043 states that the section pertains only to "determin[e] the residence *within a house district*."[33] We give this statutory phrase meaning and will not ignore its clear limiting purpose in order to apply the statute to residency both in a house district *and* residency in Alaska. We note that because Title 15's voter and candidate residency determinations require a fixed habitation, interpreting Title 15 to govern Alaska state residency determinations would improperly exclude individuals who come to Alaska

---

[30]    AS 15.05.020 (emphasis added).

[31]    AS 15.25.043 (emphasis added).

[32]    *McDonnell v. State Farm Mut. Auto. Ins. Co.*, 299 P.3d 715, 721 (Alaska 2013) (quoting *State, Dep't of Com., Cmty., & Econ. Dev., Div. of Ins. v. Progressive Cas. Ins. Co.*, 165 P.3d 624, 629 (Alaska 2007)).

[33]    AS 15.25.043 (emphasis added).

intending to remain and make their homes here, but move from place to place within Alaska during their first years in the state.

The statutory text does state that the definition is "for the purposes of compliance" with article II, section 2 of the Alaska Constitution.[34] This language could be construed to indicate that the provision broadly encompasses residency both in a house district and in Alaska, since compliance with article II, section 2 requires both. But if that had been the legislative intent, the statute could have mentioned all or none of the three constitutional requirements. Instead, the statutory text specifically calls out only the constitutional requirement of residence in a house district. We give that choice purpose, and will not read in additional language in order to apply the statute to residency both in a house district *and* residency in Alaska.

The State points out that AS 15.25.043 is titled "Determination of residency of a candidate," which broadly interpreted could indicate that it provides a comprehensive definition of residency for all candidates.[35] But the title of the statute is not law, and any persuasive authority the title may have is far outweighed by the actual statutory text.[36] We therefore hold that AS 15.25.043 applies only to the constitutional requirement that a candidate has been a "resident . . . of the district from which elected for at least one year, immediately preceding [her] filing for office."[37]

---

[34]    *Id.*

[35]    Armstrong makes no express argument on this point, but similarly implies that the language of the statute's title indicates that it should be used to determine Alaska residency for candidates.

[36]    "[C]hapter, article, section, subsection, and paragraph headings" are not law. AS 01.05.006; *see Ketchikan Retail Liquor Dealers Ass'n v. State, Alcoholic Beverage Control Bd.*, 602 P.2d 434, 438 (Alaska 1979); *DeNuptiis v. Unocal Corp.*, 63 P.3d 272, 278 n.15 (Alaska 2003).

[37]    Alaska Const. art II, § 2. We also note that AS 15.05.010(3)'s voter qualification requirements similarly distinguish between residency in "the state" and

Given that Title 15 does not govern how a person becomes a resident *of Alaska*, applying the general definition of state residency contained in AS 01.10.055 is consistent "with the manifest intent of the legislature" that the definition should serve as "a general catch-all."[38]  We have previously used AS 01.10.055 to define residency when it is undefined in other law and statutes; doing the same here is consistent with that precedent.[39]  Lacking any other definition, the definition of residency contained in AS 01.10.055 therefore applies when determining whether a candidate has "been a resident of Alaska for at least three years" as required by the Alaska Constitution.[40]

This means that three separate statutory sections are implicated in determining a person's eligibility to serve in the legislature:  (1) the person must be a qualified voter as per AS 15.05.010 and AS 15.05.020; (2) the person must have been a resident *of Alaska* for three years as per AS 01.10.055; and (3) the person must have been a resident *of the house district* from which elected for at least one year as per AS 15.25.043 and AS 15.05.020.

B.      **Armstrong's Alaska State Residency Began On May 20, 2019.**

Alaska Statute 01.10.055 states that "[a] person establishes residency in the state by being physically present in the state with the intent to remain in the state indefinitely and to make a home in the state."[41]  Thus, establishing Alaska residency

---

residency "of the house district."  This further supports our interpretation that state residency requirements differ from house district residency requirements.

[38]      AS 01.10.020; Minutes, H. State Affs. Standing Comm. Hearing on H.B. 323, 13th Leg., 1st Sess. 1:15-2:00 p.m. (Apr. 13, 1983) (statements of Bob Maynard, Counsel).

[39]      *See, e.g.*, *Mouritsen v. Mouritsen*, 459 P.3d 476, 484 (Alaska 2020) (holding term "presently resides" in Uniform Child Custody Jurisdiction & Enforcement Act should be interpreted consistently with general residency definition).

[40]      Alaska Const. art II, § 2.

[41]      AS 01.10.055(a).

requires two conditions to occur simultaneously: physical presence in the state and an intent to remain permanently and make a home.

After a person establishes residency, Title 1 requires that a person demonstrate intent to remain indefinitely and retain residency by acting consistently with the intent to remain, even during absences.[42] Subsection (b) describes how a person must "demonstrate" the required "intent to remain" in Alaska: by showing intent by "maintaining a principal place of abode in the state for at least 30 days" and by providing other proof of intent as required by law or regulation.[43] Additionally, a resident retains residency during an absence unless the resident establishes residency elsewhere or is "absent under circumstances that are inconsistent with the intent" to make Alaska home.[44]

Given the superior court's factual findings, which are supported by evidence in the record, we conclude that Armstrong met the Title 1 requirements for establishing residency in Alaska as of May 20, 2019.

### 1. On May 20, 2019, Armstrong was physically present in Alaska with the intent to remain indefinitely and make her home here.

On May 20, 2019, Armstrong established Alaska residency under Title 1 by being physically present with the intent to remain and make her home here. We analyze a person's intent to remain and make a home as part of a "holistic approach" under Title 1.[45] There is no dispute that Armstrong was physically present in Alaska on May 20, 2019. And there is no dispute that Armstrong did, at some point, form the intent necessary to become a resident of Alaska. The parties' disagreement focuses on when Armstrong formed the necessary intent.

---

[42] AS 01.10.055(b), (c).

[43] AS 01.10.055(b).

[44] AS 01.10.055(c).

[45] *Mouritsen v. Mouritsen*, 459 P.3d 476, 480 (Alaska 2020).

Armstrong contends, and the superior court found, that Armstrong formed the intent to remain in Alaska indefinitely and to make her home here on May 20, 2019. Vazquez argues that Armstrong did not form or demonstrate the necessary intent until at least June 7 or 8, 2019. Recognizing that the superior court carefully weighed the evidence on this issue, and observing that the court's findings are supported by evidence in the record, we conclude that the court did not clearly err by identifying May 20, 2019, as the date upon which Armstrong formed an intent to remain in the state indefinitely and to make Alaska her home.[46]

Although Vazquez emphasizes evidence that tends to question or contradict the superior court's finding, the record contains ample evidence supporting the finding that Armstrong intended to remain in Alaska and make her home at Kellie's Anchorage address as of May 20, 2019. Armstrong and Kellie testified that Armstrong selected her home in Alaska with Kellie between May 19 and May 20, 2019, following substantial discussions about marriage, children, and moving in together at Kellie's Anchorage address. The superior court described this as Armstrong's "emotional decision to spend the rest of her life with Kellie, a factor relevant to establish her residency." The court also noted that "Armstrong's emotional attachment to Alaska did not start when she arrived in May 2019; it began after the video call . . . in January 2019. Both Armstrong and Kellie testified that their relationship became 'romantic' prior to her arrival in May." The court recognized that Armstrong decided to "move to Alaska because she was in love." The court expressly found both Armstrong's and Kellie's

---

[46] In its findings, the superior court addressed the Title 15 residency requirements. However, those factual findings, which are not clearly erroneous, also support establishment of Title 1 residency as of May 20, 2019.

testimony on the relevant points to be credible, with no indication of fraud or misrepresentation.[47]

Armstrong's objective actions at the time and since support the testimony offered by both she and Kellie. Armstrong indicated in an August 2019 text to her colleague that she had moved her "home base" to Alaska in May, and her actions since are consistent with this assertion. Armstrong left some belongings in Anchorage when she departed, and her trip out of state was for the sole purpose of attending prior commitments. She returned to Alaska just a few weeks later, and attempted to return even earlier. Additionally, in July and August 2019 Armstrong re-licensed her business in Alaska, obtained an Alaska driver's license, and registered as an Alaska voter. Later, Armstrong had her books shipped to Alaska and emptied a shared storage unit in Louisiana.

Armstrong and Kellie ultimately enacted the plans they testified to making on May 20, 2019, further demonstrating Armstrong's intent to remain and make her home in Alaska. Armstrong and Kellie renovated a home in 2019 and they purchased a home in Anchorage in September 2020. They married in October 2020. They also had a child together, have co-parented Kellie's daughter, and have served as non-legal guardians to two girls in Alaska. We consider these later actions consistent with a finding that Armstrong intended to remain and make her home in Anchorage as of May 20, 2019.

Vazquez repeatedly references a series of Instagram posts as evidence that Armstrong publicly stated on June 13, 2019, that she moved to Alaska "last weekend," or June 7 at the earliest. The superior court did not reference these arguments in its

---

[47] *Cf. Lake & Peninsula Borough Assembly v. Oberlatz*, 329 P.3d 214, 222 (Alaska 2014) (instructing courts to consider whether voter's statement of intent was supported by "sufficient indicia of residency," or contradicted by objective "indicia of fraud or unreasonableness or implausibility").

order.  But while this evidence does raise an inconsistency, it does not convince us that the court clearly erred in its findings.

On June 13, 2019, Armstrong posted thirteen images, accompanied by free-form present-tense diaristic captions that were location-tagged broadly from the Alaska Wildlife Conservation Center to Talkeetna to Seattle to New York.  One caption does state that "I'm in Toronto with [Kellie] right now, but last weekend I moved to Alaska."  But other captions say "I'm in Seattle and hopping on the light rail"; "It's my last day in Alaska"; "We wake up Saturday in Seward"; "We land in Talkeetna"; and "I am leaving L.A. for Anchorage."  As Armstrong could not physically be at all of these places on June 13, the posts represent a stylized collection of experiences over a two-week timespan, and in that context we are not convinced that Armstrong's reference to "last weekend" necessarily means June 7-8.  Armstrong testified that she would frequently draft language for her Instagram posts ahead of time, so her posts were more diaristic recollections than precise calendar updates.  And as Armstrong argues, the captions themselves "left no doubt that this series of Instagram posts was clearly not drafted contemporaneously with their posting."  Given the style and content, the superior court need not have credited any one of Armstrong's loosely written captions as clear evidence of her whereabouts or timeline for moving to Alaska.

In addition, two other social media posts support Armstrong's residency beginning in May 2019.  On May 14, 2020, Armstrong posted a picture with a caption of:  "this time a year ago i began an epic adventure in alaska [sic]."  And in May 2021 Armstrong stated, "Two years ago today I landed in Alaska [and] . . . I never left."  Thus, Armstrong's Instagram captions do not clearly contradict the superior court's finding that Armstrong intended to remain and make her home in Alaska on May 20, 2019.

While there is some additional evidence that could weigh against the finding that Armstrong intended to remain and make a permanent home in Alaska in May 2019, that evidence ultimately does not render the superior court's finding clearly

erroneous. For example, the majority of Armstrong's personal items arrived in Alaska at a later date and she did not empty her out-of-state shared storage unit until sometime in 2020. But as the superior court noted, the date the majority of Armstrong's belongings arrived is not necessarily dispositive because the amount or type of belongings she left is "not in itself indicative" of her intent to remain. Armstrong also obtained her Alaska driver's license and registration to vote in August 2019, but we agree with the superior court that "evidence of voter registration does not establish the date of residency."[48] We also note that while moving possessions and obtaining a license may provide objective evidence of a person's *intent* to remain, those actions regularly occur after a person's intent is formed and do not provide a good indication of a person's exact date of residency.

Finally, Armstrong's fishing licenses are inconsistent in their reflection of the beginning of her state residency. But the superior court expressly found credible Armstrong's testimony about why she provided the date of her first full month spent in Alaska on her first two resident sport fishing licenses — instead of the exact date her Alaska residency began — in "an abundance of caution." The court determined that it was "not unreasonable or otherwise fraudulent" for Armstrong to list her residency in that manner for fishing licenses because it was "not indicative of an intent to 'back-date' her residency." The court expressly found Armstrong's testimony to be reasonable and to be free from "fraud or misrepresentation."[49] Moreover, in weighing the evidence, the court specifically deemed "evidence of Armstrong's fishing licenses . . . insufficient to support [that] she considered anywhere else other than Alaska" as home during the period at issue. In light of the deference we give to the

_____

[48] Residence can be established without registering to vote. *Cf. Cissna v. Stout*, 931 P.2d 363, 368 (Alaska 1996) (not filing new voter registration insufficient to defeat claim that residence has changed).

[49] *Oberlatz*, 329 P.3d at 222.

superior court's assessments of credibility and weighing of evidence,[50] the evidence related to Armstrong's fishing licenses does not render the superior court's findings regarding Armstrong's intent clearly erroneous.

### 2. After establishing residency on May 20, 2019, Armstrong demonstrated her intent to remain and retained her residency.

After a person forms the intent necessary to establish residency, Title 1 requires that person to demonstrate intent by maintaining a principal place of abode within Alaska for at least 30 days and by acting consistently with the intent to remain, even during absences.[51] We conclude that Armstrong met both requirements. She maintained her principal place of abode in Alaska for at least 30 days after May 20, 2019, and her absences after establishing residency were not inconsistent with her residency in Alaska.[52]

Armstrong's principal place of abode in Alaska was Kellie's Anchorage home, and after establishing her residency there on May 20 she maintained that principal place of abode for at least 30 days. The superior court made several findings consistent with this conclusion. For example, Armstrong left personal belongings at

---

[50] *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011).

[51] AS 01.10.055(a)-(c). We note that these requirements are among the limiting principles that the dissent suggests are missing when it comes to analyzing the establishment of one's residency in the state. *See* Dissent at 1.

[52] We reject any interpretation of AS 01.10.055 that would lead to the conclusion Armstrong was not a resident because she had not been physically in the state for "at least 30 days," and note that Vazquez correctly did not attempt to advance such an interpretation. This interpretation would fail on the clear text of the statute. And we decline to interpret the statute as a durational residency requirement, which is "more susceptible to constitutional infirmity" as a burden on the right to migrate. *Heller v. State, Dep't of Revenue*, 314 P.3d 69, 78 (Alaska 2013). The statute clearly states that residency is established at the moment at which a person is "physically present in the state with the intent to remain." AS 01.10.055(a). Thus, remaining in the state for 30 days is not a requirement to establish residency; rather, it is evidence demonstrating the requisite intent to remain once residency has been established.

Kellie's house beginning on May 20. Prior to this date Armstrong considered herself "location independent" and had sold most of her belongings. Thus, by leaving behind a portion of what few personal belongings she had and designating a place as her "home base," she established a principal place of abode.[53]

Further, Armstrong retained her Alaska residency after establishing it on May 20 because her subsequent absence, though substantial, was still consistent with Alaska residency. Armstrong left Alaska on May 20 to attend "prior commitments." Attendance at these commitments, which included a professional training and wedding events, were in no way inconsistent with an intent to make Alaska her residence. She testified that when she left she intended to return to her new Anchorage home with Kellie. Armstrong even considered returning to Alaska between her commitments, but eventually decided it was not feasible. The superior court found no evidence that Armstrong's trip from May 20 to June 8 somehow negated her intent to maintain Alaska residency, and Vazquez points to no evidence that establishes clear error.

Vazquez contends that allowing establishment of residency in circumstances like Armstrong's might open the door to "any of the millions of cruise ship passengers who visit Alaska each year" and allow those persons to form an intent and then backdate their residency to their vacation. But we are not persuaded. Armstrong's circumstances in becoming a resident are very distinct from those of the many cruise ship passengers and others who visit Alaska yearly. Starting on May 20, 2019, Armstrong both formed the intent to make her home in and remain in Alaska, and

---

[53] *Cf.* 20 Alaska Administrative Code 15.060(h)(4) (listing evidence that can show someone's principal place of abode is in Alaska for student loan purposes, including "rent receipts, proof of home ownership, or other proof, . . . including the location of the recipient's household goods"). Because Armstrong moved in with Kellie, she would not have rent receipts or proof of home ownership, but she did establish the location of her household goods. We note that the ease with which Armstrong was able to establish a principal place of abode is unique, due to her previous status as "location independent" and ability to move in with another person.

she demonstrated her intent through subsequent actions. Indeed, a casual visit to Alaska in itself would not demonstrate the intent necessary to establish residency. And in contrast to a typical temporary visitor, Armstrong both maintained a principal place of abode in the state and refrained from behavior tending to support residency elsewhere as of May 20. Indeed, Armstrong proceeded to build a life and a family in Alaska. Vazquez's cruise ship hypothetical simply fails to capture Armstrong's circumstances. Such temporary visitors to Alaska are unable to prove the necessary intent under AS 01.10.055(b) when they have no abode in Alaska and generally return to their non-Alaska abode at the end of their vacation.[54]

### 3. Summary

The superior court's factual findings, supported by the record, establish that Armstrong became an Alaska resident on May 20, 2019, when she was both present in the state and decided to move into the home of her now husband. Armstrong's later actions were consistent with those of a new resident with a permanent home in Alaska. The superior court's findings on these points are not clearly erroneous. We therefore conclude that Armstrong satisfied Title 1's state residency requirements, was a resident of Alaska for at least three years prior to the candidacy filing deadline, and is eligible to serve in the legislature.

---

[54] The dissent presents a similar hypothetical where the visitor, in addition to forming the intent to remain in Alaska, rents a room from a property owner before leaving the state as originally scheduled, and later travels extensively before returning to Alaska. *See* Dissent at 1. Missing from this hypothetical, however, is any further analysis of whether the facts particular to this tourist demonstrated that he "maintain[ed] a principal place of abode in the state" and provided other proof of intent pursuant to AS 01.10.055(b) or whether the tourist acted or was absent from the state under circumstances inconsistent with the intent to remain under AS 01.10.055(c). Here, the superior court heard and considered detailed evidence regarding each of these points, and after weighing that evidence, determined that Armstrong demonstrated the requisite intent.

## V.    CONCLUSION

We AFFIRM the superior court's decision that Armstrong met the constitutional requirements, including the three-year state residency requirement, for serving in the legislature.

CARNEY, Justice, dissenting.

I do not question the sincerity of Jennie Armstrong's love for and commitment to her life in Alaska, a commitment she has demonstrated in both her personal and now professional life. But because I am not persuaded that she established her residency here before June 1, 2019, I respectfully dissent.

The court's decision appears to open the door for almost any tourist that falls in love with Alaska or an Alaskan to immediately become a state resident. Consider a hypothetical tourist who arrived in Alaska for a ten-day vacation. On the last day of his vacation, the tourist decided he wanted to make Alaska his home. He talked to a local property owner, who agreed he could rent a room when he returned and that he could leave a few belongings with the property owner in the meantime. The tourist then left Alaska as scheduled to the place his trip began. Before returning to Alaska, the tourist travelled extensively. He returned to his prior abode only to collect the remainder of his belongings and had them sent to Alaska. After completing his travels, the tourist returned to Alaska and moved into the room he had arranged to occupy while he was on vacation.

As I understand today's decision, because the tourist stated his intent to return to Alaska before leaving the state at the end of his original vacation, he became an Alaska resident at that moment. If there is a limiting principle to the court's interpretation of AS 01.10.055 I am unable to discern it; unless the new resident, like Armstrong, wants to run for a legislative seat, Title 15's requirements do not apply. Is there a time when a person's absence from Alaska after stating an intent to become an Alaskan is too long? The court makes clear that several weeks is not too long.[1] Would a month be too long? Several months? A year?

---

[1]    *See* Opinion at 18.

The court acknowledges that Armstrong's situation is unique, noting her lack of previous fixed address.[2] But what truly makes this case unique is the importance of the date Armstrong established residency to her candidacy. If not for the June 1 deadline for her "last-minute" decision to run for office, it would be of little importance whether her residency started when she declared she was "all in" in late May or when she flew back to Anchorage on June 8 and began to live there. This case is also likely unique because even if the court agreed with my position, the final result could be the same. The likely remedy would have been to require a new election for that position; by that date, Armstrong's residency would be undisputed.[3]

I recognize the deference we accord to the superior court's findings of fact.[4] But I believe that the court clearly erred both in its reliance on after-the-fact actions and its consideration of Armstrong's fishing licenses. The sincerity of Armstrong's intent to become an Alaskan was not questioned, yet the evidence that the superior court and this court relied upon (her marriage, her community involvement, her Alaska business and fishing licenses) supports that sincerity rather than the date on which she established and began to maintain "a principal place of abode" in the state.[5] In particular it appears that the court did not consider whether any indicia of implausibility[6] accompanied Armstrong's assertion that the 2022 fishing license, obtained nearly two months after the filing deadline to run for office, was simply more accurate than the previous ones. Or the assertion that the difference in the dates was

---

[2] Opinion at 22 n.53.

[3] *See Boucher v. Bomhoff*, 495 P.2d 77, 82-83 (Alaska 1972).

[4] *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011).

[5] AS 01.10.055(b) (describing how a person demonstrates the requisite intent to establish Alaskan residency).

[6] *Lake & Peninsula Borough Assembly v. Oberlatz*, 329 P.3d 214, 222 (Alaska 2014).

due to the "importance" of Alaska fishing licenses, as opposed to the importance of meeting the qualifications to run for elected office.

I respectfully dissent.