*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

## THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| LA QUEN NÁAY ELIZABETH MEDICINE CROW, AMBER LEE, and KEVIN MCGEE, | Supreme Court No. S-19182 |
| Appellants, | Superior Court No. 3AN-24-05615 CI |
| v. | O P I N I O N |
| CAROL BEECHER, in an official capacity as DIRECTOR, ALASKA DIVISION OF ELECTIONS; NANCY DAHLSTROM, in an official capacity as LIEUTENANT GOVERNOR; and the STATE OF ALASKA, DIVISION OF ELECTIONS, | No. 7775 – June 27, 2025 |
| Appellees, | |
| and | |
| DR. ARTHUR MATHIAS, PHILLIP IZON, and JAMIE R. DONLEY, | |
| Intervenors-Appellees. | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Christina A. Rankin, Judge.

Appearances: Scott M. Kendall, Jahna M. Lindemuth, Samuel G. Gottstein, and C. Maeve Kendall, Cashion Gilmore & Lindemuth, Anchorage, for Appellants.

Kimberly D. Rodgers and Thomas S. Flynn, Assistant Attorneys General, Anchorage, Lael A. Harrison, Assistant Attorney General, Juneau, and Treg Taylor, Attorney General, Juneau, for Appellees. Kevin G. Clarkson, Law Offices of Kevin G. Clarkson, LLC, Anchorage, for Intervenors-Appellees.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

MAASSEN, Chief Justice.

## I. INTRODUCTION

Three Alaska residents brought suit to challenge the process used by the Division of Elections to certify a ballot initiative intended for the November 2024 general election ballot. One of their allegations was that the Division violated its own regulations and the governing statutes by allowing corrections to circulators' certifications of the petition booklets used to gather supporting signatures. The superior court granted summary judgment on that issue to the Division and the petition's sponsors, who had intervened in the case. Following trial on the remaining issues, the court ordered the Division to reject some signatures and booklets, though enough remained to keep the initiative on the ballot.

If the Division's certification correction policy had been held unlawful, however, the number of valid signatures would have been less than what was needed for the initiative to qualify for the ballot. The challengers therefore appeal the superior court's summary judgment on that issue.

Concluding that the superior court's decision correctly interpreted the governing statutes and regulations, we affirmed its judgment after oral argument. This opinion explains our reasoning.

## II.    FACTS AND PROCEEDINGS

### A.    Facts[1]

Phillip Izon, Jamie R. Donley, and Dr. Arthur Mathias (collectively the sponsors) filed an application for a citizen ballot initiative in November 2022. The initiative sought to end the system of open primaries and ranked-choice voting that had been adopted by initiative in 2020. The Division of Elections certified the sponsors' application on January 20, 2023, identifying the initiative as 22AKHE.

On February 8 the Division issued petition booklets to the sponsors, starting the statutory one-year period for gathering signatures in support; the signature-gathering deadline was thus February 7, 2024.[2] The sponsors attended a training session that covered the legal and regulatory requirements for gathering signatures and submitting petitions. The parties agree that there were nonetheless some improprieties during the signature-gathering process, such as leaving petition booklets unattended at two locations.

On January 12, 2024, the sponsors submitted 655 petition booklets to the Division. After an initial review for facial sufficiency, the Division accepted 641 of them. By statute, the Division then had 60 days to complete its review and determine whether the initiative qualified for the ballot.[3]

---

[1]    The parties stipulated to relevant facts and expedited litigation deadlines early in the case.

[2]    AS 15.45.140(a) ("The sponsors must file the initiative petition within one year from the time the sponsors received notice from the lieutenant governor that the petitions were ready for delivery to them.").

[3]    *See* AS 15.45.150 ("Within not more than 60 days of the date the petition was filed, the lieutenant governor shall review the petition and shall notify the initiative committee whether the petition was properly or improperly filed, and at which election the proposition shall be placed on the ballot.").

Another aspect of the relevant time frame is tied to the legislative session: if an initiative is approved for the ballot, it must be placed on the ballot for "the first statewide general, special, special primary, or primary election that is held after (1) the petition has been filed; (2) a legislative session has convened and adjourned; and (3) a period of 120 days has expired since the adjournment of the legislative session."[4]  The Thirty-Third Alaska Legislature convened for its Second Regular Session on January 16, four days after the sponsors filed their petition; this meant that if the initiative was approved it could appear on the November general election ballot.

During its review process, the Division found more errors and returned 64 booklets to the sponsors for corrections.  Sixty of those booklets had been certified by a notary whose commission had expired; three of them had missing or incorrect notarization dates; and one failed to identify the certifier's location.  The sponsors corrected and resubmitted 62 of the returned booklets between February 12 and March 1.  On March 8, four days before the end of the 60-day review period, the Division finished counting the booklets — including the ones that had been corrected and resubmitted — and determined that the requirements for 22AKHE to appear on the November ballot had been satisfied.

B.     Proceedings

In April 2024 Alaska residents La Quen Náay Elizabeth Medicine Crow, Amber Lee, and Kevin McGee (collectively Medicine Crow) filed a complaint[5] against the Lieutenant Governor, the Division of Elections, and the Division's director

---

[4]     AS 15.45.190.

[5]     The complaint was filed pursuant to AS 15.45.240, which provides: "Any person aggrieved by a determination made by the lieutenant governor under AS 15.45.010-15.45.220 may bring an action in the superior court to have the determination reviewed within 30 days of the date on which notice of the determination was given."

(collectively the Division), challenging the Division's determination that 22AKHE was properly filed under article XI, section 3 of the Alaska Constitution[6] and AS 15.45.160.[7] The superior court permitted the initiative's sponsors to intervene. All parties agreed that claims about the Division's compliance with certification statutes and regulations would be resolved on cross-motions for summary judgment, with any remaining claims to be decided at a bench trial.

### 1. Summary judgment

Medicine Crow argued in her motion for summary judgment that the Division's decision to approve 22AKHE for the ballot "violated the applicable statutes and regulations." She argued that the statutory scheme governing initiatives does not allow sponsors to cure defective booklets after the Division has begun its review, and that even if the Division could allow a "piecemeal cure process," the process it used here resulted in the sponsors missing the statutory deadlines. In opposition the Division argued that the relevant statute authorizes sponsor corrections to certifications during the review process, that the Division's reading of the statute is consistent with its own regulations and the legislature's intent, that sponsors may correct certifications within the 60-day review period even after the one-year deadline and the beginning of the

---

[6]    "After certification of the application, a petition containing a summary of the subject matter shall be prepared by the lieutenant governor for circulation by the sponsors. If signed by qualified voters who are equal in number to at least ten percent of those who voted in the preceding general election, who are resident in at least three-fourths of the house districts of the State, and who, in each of those house districts, are equal in number to at least seven percent of those who voted in the preceding general election in the house district, it may be filed with the lieutenant governor." Alaska Const. art XI, § 3.

[7]    "The lieutenant governor shall notify the committee that the petition was improperly filed upon determining that (1) there is an insufficient number of qualified subscribers; (2) the subscribers were not resident in at least three-fourths of the house districts of the state; or (3) there is an insufficient number of qualified subscribers from each of the house districts described in (2) of this section." AS 15.45.160.

legislative session, and that allowing corrections furthers the will of the voters, thus aligning with the constitutional right to enact laws by initiative. The sponsors' summary judgment briefing made similar arguments.

The superior court ruled on these motions in early June. It denied Medicine Crow's motion for summary judgment and granted the Division's.[8] The court decided that AS 15.45.130 allows the Division to return booklets to sponsors for correction after the petition is filed as long as the Division has not yet completed its signature-counting process. It reasoned that the regulation requiring a petition to be filed as a "single instrument"[9] does not prohibit later correction or re-filing of individual booklets, and another regulation requiring the Division to return petitions with a "patent defect"[10] only applies when the defect is discoverable at the time of submission, during the initial facial review, which was not the case here. The court concluded that the Division did not violate the governing statutes; that the legislative history indicates an intent to prevent sponsors from gathering *additional* signatures after timely filing their petition, not correcting certification affidavits already submitted; and that the legislature's overall intent was "to *remove* barriers in the petition process, and thus make it easier for circulators to certify their booklets by allowing corrections to certification affidavits, even after filing." (Emphasis in original.)

According to the superior court, its decision was consistent with "a 'constitutional principle[]' of 'interpret[ing] legislative procedures in favor of the

---

[8]     The sponsors had crossed-moved for summary judgment on all issues; the court decided only the issues that were also raised by the Division.

[9]     6 AAC 25.240(c).

[10]     6 AAC 25.240(f).

exercise of the initiative power.' "[11] It explained that errors in certification, such as with a notary commission, should not necessarily mean that the signatures in those booklets are not counted, thus disenfranchising those voters. The court's conclusion, in sum, was that the governing law allowed corrections to certifications to be made after the timely submission of a petition as long as they came within the Division's 60-day review period.

### 2. Bench trial

Trial on the remaining claims was held over five days in late June and early July. These claims were more fact-dependent than the statutory interpretation questions: they alleged that the circulators had collected some signatures unlawfully and the Division violated the law by counting them. Medicine Crow asked the court to invalidate those signatures and order the rejection of both booklets that had been unlawfully circulated and booklets from circulators who were found to have perjured themselves.

The superior court issued findings of fact and conclusions of law on July 19. It concluded that some petition booklets had to be disqualified because of "instances of non-compliant signature gathering," and it ordered the Division to remove all improperly counted signatures and decide whether there were still enough to support the petition. The Division did so, notifying the court on July 23 "that the 22AKHE petition has sufficient signatures statewide and in 33 of 40 house districts." The court entered final judgment the next day against Medicine Crow and ruled that the initiative would remain on the November ballot.

Medicine Crow immediately appealed, focusing on the summary judgment ruling. We granted an emergency request to expedite the appeal because of

---

[11] *N. W. Cruiseship Ass'n of Alaska, Inc. v. State, Off. of Lieutenant Governor, Div. of Elections*, 145 P.3d 573, 582, 586 (Alaska 2006) (alterations by superior court).

the Division's September 3 deadline for printing the general election ballots. On August 22, following oral argument, we issued a summary order affirming the superior court's grant of summary judgment; this opinion explains our reasoning.

## II. STANDARD OF REVIEW

We review a grant of summary judgment de novo, applying our independent judgment and "adopting the rule of law most persuasive in light of precedent, reason, and policy."[12] "We review an agency interpretation of statutory terms using one of two standards: reasonable basis or independent judgment."[13] If "the agency's specialized knowledge and experience are not particularly relevant to the issue at hand"[14] and "the issue is one of 'statutory interpretation requiring the application and analysis of various canons of statutory construction,' "[15] we review using our independent judgment. In doing so we "interpret[] the statute according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[16]

## III. DISCUSSION

The Alaska Constitution provides that "[t]he people may propose and enact laws by the initiative."[17] How the people are to go about exercising that power is

---

[12]     *Societe Fin., LLC v. MJ Corp.*, 542 P.3d 1159, 1165 (Alaska 2024) (quoting *Kimp v. Fire Lake Plaza II, LLC*, 484 P.3d 80, 86 (Alaska 2021)).

[13]     *Guerin v. State, Off. of Lieutenant Governor, Div. of Elections*, 537 P.3d 770, 777 (Alaska 2023) (quoting *PLC, LLC v. State, Dep't of Nat. Res.*, 484 P.3d 572, 577 (Alaska 2021)).

[14]     *Id.* (quoting *PLC, LLC*, 484 P.3d at 577).

[15]     *Mun. of Anchorage v. Adamson*, 301 P.3d 569, 573 (Alaska 2013) (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903-04 (Alaska 1987)).

[16]     *Aiken v. Alaska Addiction Pros. Ass'n.*, 552 P.3d 454, 463 (Alaska 2024) (quoting *Johnson v. State, Dep't of Corr.*, 380 P.3d 653, 655 (Alaska 2016)).

[17]     Alaska Const. art. XI, § 1.

left largely to statute and regulation. At issue in this appeal is the language of the statutes and regulations detailing the process that allowed 22AKHE to reach the November 2024 general election ballot.

### A. Alaska Statute 15.45.130 Allows Sponsors To Correct Circulators' Certifications After The Statutory Petition-Filing Deadlines.

The legislature, by statute, has prescribed the process for the filing and review of an initiative petition.[18] The law provides that after the collection of signatures and before the petition is filed, "each petition shall be certified by an affidavit by the person who personally circulated the petition," and it further provides that "the lieutenant governor may not count subscriptions on petitions not properly certified at the time of filing or corrected before the subscriptions are counted."[19] "The sponsors must file the initiative petition within one year from the time the sponsors received notice from the lieutenant governor that the petitions were ready for delivery to them."[20] Then, "[w]ithin not more than 60 days of the date the petition was filed, the lieutenant governor shall review the petition and shall notify the initiative committee whether the

---

[18] AS 15.45.090-.160.

[19] AS 15.45.130. The affidavit must state "(1) that the person signing the affidavit meets the residency, age, and citizenship qualifications for circulating a petition under AS 15.45.105; (2) that the person is the only circulator of that petition; (3) that the signatures were made in the circulator's actual presence; (4) that, to the best of the circulator's knowledge, the signatures are the signatures of the persons whose names they purport to be; (5) that, to the best of the circulator's knowledge, the signatures are of persons who were qualified voters on the date of signature . . . ; (7) that the circulator has not violated AS 15.45.110(d) with respect to that petition; and (8) whether the circulator has received payment or agreed to receive payment for the collection of signatures on the petition, and, if so, the name of each person or organization that has paid or agreed to pay the circulator for collection of signatures on the petition." Item six addresses a requirement that has been held unconstitutional and as such is not enforced. *See Res. Dev. Council for Alaska, Inc. v. Vote Yes for Alaska's Fair Share*, 494 P.3d 541, 553-54 (Alaska 2021)).

[20] AS 15.45.140(a).

petition was properly or improperly filed, and at which election the proposition shall be placed on the ballot."[21]  A petition is not properly filed if "(1) there is an insufficient number of qualified subscribers; (2) the subscribers were not resident in at least three-fourths of the house districts of the state; or (3) there is an insufficient number of qualified subscribers from each of the house districts described in (2) of this section."[22] If a petition is properly filed, the lieutenant governor is required to place the initiative on the ballot for the first statewide election that is held after a legislative session has convened and adjourned and 120 days have passed since the adjournment.[23]

Medicine Crow argues that the superior court erred by allowing certifications to be corrected after the filing deadlines.  She raises essentially two questions of statutory interpretation:  (1) do the statutory filing deadlines allow post-filing corrections to the circulators' certifications, and (2) if so, are those corrections limited to "technical" corrections, as opposed to (as happened here) the replacement of deficient certifications with proper ones?  Both questions require us to interpret AS 15.45.130, the statute governing corrections to petition certifications.[24]

### 1. The plain text of section .130 allows sponsors to correct circulators' certifications after the filing deadlines.

Medicine Crow's argument involves two petition-filing deadlines: AS 15.45.140, tied to when the petition booklets are initially distributed to the

---

[21]  AS 15.45.150.

[22]  AS 15.45.160.

[23]  AS 15.45.190.

[24]  AS 15.45.130 ("[T]he lieutenant governor may not count subscriptions on petitions not properly certified at the time of filing or corrected before the subscriptions are counted.").

sponsors,[25] and AS 15.45.190, tied to the legislative session.[26]  The parties agree on all relevant dates.  The sponsors timely filed the petition on January 12, 2024, and the Division's 60-day review period under AS 15.45.150 for determining the petition's sufficiency thus ended on March 12.  Between January 23 and February 21, the sponsors retrieved 64 booklets after the Division notified them of certification errors, and they returned 62 corrected booklets to the Division between February 12 and March 1; this was after both the one-year signature-gathering period (found in section .140) and the start of the legislative session (relevant to section .190) but before the end of the 60-day review period.  Because none of these dates is disputed, the question for our review is purely legal:  whether the Division was correct to count the signatures in the 62 booklets that were rejected, corrected, and then returned to the Division before the end of the counting process.

Medicine Crow argues that "[t]he plain language of the Division's regulation makes it crystal clear that a defective initiative petition cannot be cured after the one-year deadline under any circumstances" and that to hold otherwise disrupts the "regulatory whole" of the statutory scheme governing the initiative process.  She concedes that section .130 allows petitions to be corrected after submission, so long as those corrections occur "before the subscriptions are counted."  But she reads that qualifying phrase as meaning that corrections must be submitted before the Division *begins* counting any signatures during its review process — not once the review process is underway.

---

[25]    *See* AS 15.45.140(a) ("The sponsors must file the initiative petition within one year from the time the sponsors received notice from the lieutenant governor that the petitions were ready for delivery to them.").

[26]    *See* AS 15.45.190 ("The lieutenant governor shall direct the director to place the [initiative] on the election ballot of the first statewide . . . election that is held after . . . a legislative session has convened and adjourned.").

We use a "sliding-scale approach" to interpret statutory language: "[T]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be" to justify a different interpretation.[27] We construe statutory terms in accordance with their common usage, unless a term has "acquired a peculiar meaning, by virtue of statutory definition or judicial construction."[28] When interpreting statutes, we presume "that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous."[29] "It is a canon of statutory construction that the reading of the statute should not render any of its sections meaningless."[30] Finally, we interpret statutes "in context with other pertinent provisions rather than in isolation, and with a view toward reconciling conflict and producing a harmonious whole."[31]

Alaska Statute 15.45.130 reads in relevant part: "In determining the sufficiency of the petition, the lieutenant governor may not count subscriptions on petitions not properly certified at the time of filing or corrected before the subscriptions are counted." The statute addresses requirements for certifications of signature booklets generally. But the sentence at issue, by beginning with "[i]n determining the sufficiency

---

[27] *Guerin v. State, Off. of Lieutenant Governor, Div. of Elections*, 537 P.3d 770, 778 (Alaska 2023) (alteration in original) (quoting *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019)).

[28] *City of Valdez v. State*, 372 P.3d 240, 251 (Alaska 2016) (quoting *Mun. of Anchorage v. Suzuki,* 41 P.3d 147, 150 (Alaska 2002)).

[29] *Vazquez v. State, Off. of Lieutenant Governor, Div. of Elections*, 544 P.3d 1178, 1187 (Alaska 2024) (quoting *McDonnell v. State Farm Mut. Auto. Ins. Co.*, 299 P.3d 715, 721 (Alaska 2013)).

[30] *Suzuki*, 41 P.3d at 151.

[31] *Blythe P. v. State, Dep't. of Health & Soc. Servs., Off. of Child.'s Servs.*, 524 P.3d 238, 246 (Alaska 2023) (quoting *Good v. Mun. of Anchorage*, 450 P.3d 693, 698 (Alaska App. 2019)).

of the petition," anchors this particular aspect of the law to the Division's 60-day review period, when the lieutenant governor is reviewing the petition for its sufficiency.[32]

We apply common rules of grammar when interpreting statutes; thus we read "or" as disjunctive, marking an alternative.[33] The lieutenant governor may not count signature booklets that are not properly certified when initially filed with the Division *or* are not corrected "before the subscriptions are counted." The alternative phrasing means that the submission of improperly certified signature booklets "at the time of filing" does not necessarily disqualify them; as an alternative, they may still be corrected and counted. The canon that the legislature intends every provision in a statute to have some purpose, force, or effect[34] also supports the conclusion that section .130 is intended to allow corrections to improper certifications. To hold otherwise would render meaningless the "or corrected" alternative.[35]

To support her reading of "corrected before the subscriptions are counted" as meaning before counting begins at all, Medicine Crow gives an example of a sponsor who notices a week after filing the petition that some of the signature booklets lack proper certification. She contends that that sponsor may correct the improper certifications if the Division has not yet begun counting signatures. Her example assumes a process in which the Division might not begin counting signatures as soon as the petition is filed, despite the immediate commencement of the 60-day review period. This raises the specter of a corrections deadline that varies from petition to petition, dependent not on any statutory timetable but rather on the promptness with

---

[32]    *See* AS 15.45.150-.160.

[33]    *State v. Fyfe*, 370 P.3d 1092, 1100 (Alaska 2016) (observing that "the usual grammatical function of the word 'or' is 'to mark an alternative such as either this or that' " (quoting *In re Jesusa V.*, 85 P.3d 2, 24 (Cal. 2004))).

[34]    *Vazquez*, 544 P.3d at 1187 (quoting *McDonnell*, 299 P.3d at 721).

[35]    *See Suzuki*, 41 P.3d at 151-52.

which the Division actually begins to count signatures in a particular case, which may be dependent in turn on the Division's workload and resources at the time.

We find no statutory support for Medicine Crow's interpretation. The only statutory deadline imposed on the Division is that its review must be completed 60 days from the date the petition is filed; the review necessarily includes counting signatures.[36] The Division's Initiative Petition Training Handbook indicates that subscription counting begins immediately: "From the date a petition is filed with the division the division will begin verifying signers." The Handbook further instructs that "[d]aily the division will post the results of signature review on the division['s] website" during the review period, supporting a conclusion that subscription counting begins immediately and is ongoing throughout the review period. But whether counting begins on the day the petition is filed or a few days or weeks later in the review period, sponsors' ability to make corrections should not depend on this potentially inconsistent variable.

Medicine Crow also argues that even if corrections can occur during the review period, after the Division has begun counting signatures, certifications must all be submitted and corrected before the section .140 and .190 deadlines pass. But this reading fails to acknowledge that filing deadlines and the deadline for Division review (and thus for corrections) are distinct in the statutory scheme. By using the disjunctive "or," the legislature distinguished "at the time of filing" from "before the subscriptions are counted." The filing deadlines are set by sections .140 and .190, but the Division's review period — which begins after filing and necessarily includes the opportunity for corrections, as explained above — is defined by section .150.

---

[36]     AS 15.45.150-.160.

This reading is supported by our decision in *Yute Air Alaska, Inc. v. McAlpine*.[37] Yute Air sought to prevent an initiative from appearing on the ballot, arguing that "the signatures must be verified, that is, the voter's qualifications ascertained, before the petition may be deemed to be 'filed' for purposes of calculating the proper election at which the initiative should be submitted to the voters."[38] This involved interpreting the filing deadline created by section .190, which we explained was distinct from the subscription verification process.[39] If the legislature intended that a petition could not be deemed "filed" until the signatures had been reviewed and counted, it would have said more than just "filed."[40] The purpose of section .190 is to give the legislature a complete session to consider and potentially respond to an initiative, such as by enacting legislation that would moot it.[41] We concluded, "Both logically and as a matter of practical experience, the legislature does not need an initiative petition to be verified before it considers the same subject. It suffices for all practical purposes that a facially valid initiative be filed."[42] In both sections .190 and .140, "filed" simply means submitted, not reviewed and found sufficient for the ballot.

Medicine Crow argues that the superior court's reading of section .130 improperly distinguishes initiative filing deadlines from other election filing deadlines, contrary to our repeated statement that election filing deadlines must be strictly

---

[37]    698 P.2d 1173 (Alaska 1985).

[38]    *Id.* at 1177.

[39]    *Id.* at 1178-79.

[40]    *Id.* at 1178.

[41]    *See id.* at 1179.

[42]    *Id.*

enforced.[43]  She cites cases from other jurisdictions to illustrate this principle in the context of ballot initiatives.[44]  But the parties stipulated that the sponsors filed the petition on time, meaning that the filing deadline is not at issue.  The statute simply sets a different and later deadline for correcting certifications.  The superior court properly granted summary judgment on this issue to the Division and the sponsors.

> **2.     The plain text of section .130 allows sponsors to correct certifications by replacing deficient ones.**

Medicine Crow also contends that certification corrections — assuming AS 15.45.130 allows them — must be limited to minor ones like "adding missing dates or locations."  Here, the Division returned 60 booklets notarized by a notary with an expired commission and allowed those booklets' circulators to either self-certify or attach new and properly notarized certifications.  In Medicine Crow's view, these were not corrections to the certifications but a full "replacement" of them, which is beyond what is allowed by section .130.  Medicine Crow contends that "corrected" as used in the statute "means fixing; it cannot mean or permit the replacement or addition of brand-new certifications to booklets that lacked valid certifications upon filing."  But she cites

---

[43]     *See State v. Jeffery*, 170 P.3d 226, 234 (Alaska 2007) ("[I]t is 'well established, both in Alaska and in other jurisdictions, that election law filing deadlines are to be strictly enforced.  Strict compliance is the rule, and substantial compliance the rare exception.' " (quoting *Falke v. State*, 717 P.2d 369, 373 (Alaska 1986))); *see Guerin v. State, Off. of Lieutenant Governor, Div. of Elections*, 537 P.3d 770, 779 (Alaska 2023) ("We affirm that election deadlines are mandatory, and therefore substantial compliance is not sufficient, absent substantial confusion or impossibility." (internal quotation marks omitted) (quoting *State v. Marshall*, 633 P.2d 227, 235 (Alaska 1981))).

[44]     *See, e.g.*, *Idahoans for Open Primaries v. Labrador*, 533 P.3d 1262, 1287 (Idaho 2023) (declining to extend signature-gathering period for ballot initiative in absence of statutory authority); *Meyer v. Knudsen*, 510 P.3d 1246, 1251 (Mont. 2022) (declining to extend signature-gathering period for ballot initiative where "[t]he statutory deadlines that govern petition submission are abundantly clear").

no support for this limited reading of "corrected." Webster's Dictionary defines "correct" as "to make or set right, remove the faults or errors from";[45] the word's plain meaning does not limit the ways that a faulty thing may be set right.

In making her argument that "correction" does not include "replacement" of improper certifications, Medicine Crow relies in part on the requirement of AS 15.45.130 that petitions be certified "[b]efore being filed." But the legislature's provision for the post-filing correction of "petitions not properly certified at the time of filing" necessarily contemplates that some certifications will have to be redone *after* filing. The Division's task is to determine whether the *corrected* certification affidavits are properly certified and may therefore be counted. We see nothing in the statutory language that would require the Division to compare refiled certifications with previously rejected ones and to reject some now-proper certifications based on the nature of the deficiency that was corrected.

Medicine Crow cites *North West Cruiseship Ass'n of Alaska v. State, Office of Lieutenant Governor, Division of Elections*,[46] to support her argument that the need for "replacement" certifications is not a "technical deficiency" that may be corrected. In *North West Cruiseship* we explained that "the purpose of certification is to require circulators to swear to the truthfulness of their affidavits."[47] That purpose was not thwarted by a circulator's failure to include the location when self-certifying a petition; we therefore held that signature booklets lacking the place of certification "should not be rejected on these grounds."[48]

---

[45] *Correct*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002).

[46] 145 P.3d 573 (Alaska 2006).

[47] *Id.* at 577.

[48] *Id.* at 577-78.

This case differs factually from *North West Cruiseship* because, as Medicine Crow points out, the Division in that case accepted certifications that were technically deficient, while here the Division asked the circulators to replace deficient certifications with proper ones, which it then accepted. But we uphold the Division's decisions in both cases for the same reason: the circulators' certifications served their legal purpose. The circulators of 22AKHE, after correcting deficiencies, still had to swear to the truth of their affidavits' statements.[49]

Nothing in the text of Alaska Statute 15.45.130 or the rationale behind the certification requirements suggests that otherwise valid "replacement" certifications should be deemed invalid. We will not add limitations to section .130 that the legislature did not see fit to impose and that would potentially disenfranchise citizens who signed initiative petitions in good faith.[50] The superior court did not err by declining to distinguish between "technical corrections" and replacement certifications.

---

[49] Medicine Crow contends that "[t]he findings the superior court made at trial as to the misconduct of certain circulators reinforce the importance of the petition certification requirements" and undermine the court's earlier conclusion on summary judgment that certification errors — particularly those involving the expired notary commission — did not invalidate signature booklets and could be corrected. But the legal question of whether certifications may be corrected under AS 15.45.130 is distinct from factual questions about circulator misconduct, which are not before us on Medicine Crow's appeal. Alaska Statute 15.45.130 does not encourage fraud simply by allowing correction; whether a certification is fraudulent is a different and fact-dependent question.

[50] *See, e.g.*, *Fischer v. Stout*, 741 P.2d 217, 225 (Alaska 1987) ("Legislative history provides little guidance in interpreting the facially ambiguous phrase, 'may vote under the previous name.' Accordingly, we will seek a construction of the phrase which avoids the wholesale disfranchisement of qualified electors.").

**3.** **The legislative history of AS 15.45.130 does not contradict an interpretation that allows sponsors to correct certifications after statutory filing deadlines.**

Medicine Crow argues that the legislative history surrounding the adoption of the phrase "or corrected before the subscriptions are counted" in section .130 "does not support the superior court's interpretation allowing replacement certifications." Before 2005, AS 15.45.130 did not include the "or corrected" phrase,[51] which was added by House Bill (H.B.) 94.[52]

Medicine Crow highlights comments made by the Division's then-director during committee discussion of the bill. The director testified that "at the beginning of the process, when we can notify the carriers of the petition that they've got a problem, it can be resolved. But should it happen, should they turn in their books at the last minute, and not have that certification done, it is a way to prevent signatures [from] being counted."[53] Sponsors' failure to follow the requirements regarding payment disclosure also "become[s] a way for the petition booklet to be . . . invalidated."[54] Medicine Crow argues that these statements confirm "that initiative petitions that are filed with the Division at the last minute without proper certifications will be rejected, whereas earlier-filed petitions could still be corrected," and "submitting booklets purportedly 'notarized' by someone who is not a notary — which is what happened here — is equivalent to submitting booklets that are not notarized at all."

---

[51] As relevant to the issue at hand, former AS 15.45.130 (2004) read: "Before being filed, each petition shall be certified by an affidavit by the person who personally circulated the petition. . . . In determining the sufficiency of the petition, the lieutenant governor may not count subscriptions on petitions not properly certified."

[52] House Bill (H.B.) 94, 24th Leg., 1st Sess. (2005).

[53] Testimony of Laura Glaiser, Dir., Div. of Elections at 09:23:17-09:23:31, Hearing on H.B. 94 Before the H. State Affs. Standing Comm., 24th Leg., 1st Sess. (March 15, 2005).

[54] *Id.* at 09:23:08-09:24:23.

The director's testimony, however, was not about the possibility of corrections, but rather the procedure in place before the adoption of H.B. 94; the prior version of section .130 did not allow for the correction of certifications at all.[55] The director was commenting on a proposed amendment that would prohibit circulators from receiving any payment.[56] As written, the amendment applied only to referendum and recall petitions.[57] But the director pointed out that the law required circulators of initiative petitions to make certain disclosures about payment in their certifications of filed signature books;[58] she advised that an amendment banning payment should also apply in the context of the initiative statutes "if in fact you don't want circulators to be paid for initiative petitions."[59] Neither she nor anyone else at hearings on H.B. 94 commented on the phrase "or corrected before the subscriptions are counted."

The legislators did, however, discuss the bill's overarching purpose. In the same testimony highlighted by Medicine Crow, the director testified that the

---

[55] Former AS 15.45.130 (2004).

[56] Minutes, H. State Affs. Standing Comm. Hearing on H.B. 94, 24th Leg., 1st Sess. 09:17:47 (Mar. 15, 2005) (statement of Rep. Jay Ramras), https://www.akleg.gov/basis/Meeting/Detail?Meeting=HSTA%202005-03-15%2008:00:00.

[57] *Id.* (proposing to amend AS 15.45.340 and .360, which govern referendum petitions, and AS 15.45.580 and .600, which govern recall petitions).

[58] *Id.* at 09:22:12 (testimony of Laura Glaiser, Dir., Div. of Elections); *see* former AS 15.45.130(8) (2004) (requiring circulator's affidavit to state that "the circulator prominently placed, in the space provided under AS 15.45.090(5) before circulation of the petition, in bold capital letters, the circulator's name and, if the circulator has received payment or agreed to receive payment for the collection of signatures on the petition, the name of each person or organization that has paid or agreed to pay the circulator for collection of signatures on the petition").

[59] Minutes, H. State Affs. Standing Comm. Hearing on H.B. 94, 24th Leg., 1st Sess. 09:22:12 (Mar. 15, 2005) (testimony of Laura Glaiser, Dir., Div. of Elections), https://www.akleg.gov/basis/Meeting/Detail?Meeting=HSTA%202005-03-15%2008:00:00.

proposed legislation was intended to make things easier for petition circulators.[60] Representative Ramras stated during the hearing that "what he like[d] best about H.B. 94 is that it's 'a low common denominator bill'; it keeps making it progressively easier for people to participate in the democratic process."[61] Another representative "echoed [the director's] comment that HB 94 is supposed to make the [initiative] process easier and friendly for a voter."[62] Allowing certifications to be corrected after the petition is filed aligns with this purpose; it allows the signatures in those booklets to be counted.

The Division highlights helpful testimony on a bill introduced a year earlier, H.B. 523, in which the "or corrected" language was first proposed.[63] In a hearing on that bill, Representative Gruenberg — who later described the purpose of H.B. 94 as to make the initiative process easier[64] — proposed an amendment that would add the "or corrected" language.[65] Representative Gruenberg explained that the purpose of this language was to allow substantive corrections, reasoning that "if

---

[60]     *Id.* at 09:22:12 (testimony of Laura Glaiser, Dir., Div. of Elections).

[61]     *Id.* at 09:14:50 (statement of Rep. Jay Ramras).

[62]     *Id.* at 09:24:55 (statement of Rep. Max Gruenberg).

[63]     H.B. 523, 23d Leg., 2d Sess. (2004). The Division concedes that this bill and testimony were not discussed at the trial court. However, it also correctly points out that "[this court] may affirm a judgment on any grounds that the record supports, even grounds not relied on by the [lower] court." *Smith v. Kofstad*, 206 P.3d 441, 444 (Alaska 2009) (second alteration in original) (quoting *Van Sickle v. McGraw,* 134 P.3d 338, 341 n.10 (Alaska 2006)).

[64]     Minutes, H. State Affs. Standing Comm. Hearing on H.B. 94, 24th Leg., 1st Sess. 09:24:55 (Mar. 15, 2005) (statement of Rep. Max Gruenberg), https://www.akleg.gov/basis/Meeting/Detail?Meeting=HSTA%202005-03-15%2008:00:00.

[65]     Minutes, H. State Affs. Standing Comm. Hearing on H.B. 523, 23d Leg., 2d Sess. (Apr. 26, 2004) (statement of Rep. Max Gruenberg), https://www.akleg.gov/basis/Meeting/Detail?Meeting=HSTA%202004-04-26%2008:17:00.

somebody makes a mistake, the petition shouldn't be thrown out, because that affects hundreds of people who have signed the petition in good faith."[66] Division Director Laura Glaiser added that the amendment would mean that "[i]f we find . . . a circulator hasn't filled out the affidavit, we can make that correction and then count all those signatures in the books, rather than casting them aside due to a technical failure by the circulator," which would be an "improvement" on the current process.[67] The Division and superior court's interpretation of the "or corrected" language accords with these statements of purpose, allowing voters' signatures to be counted once mistakes on certifications have been corrected.

Medicine Crow also argues that her reading of "corrected" to allow only technical fixes is supported by the legislature's repeal of AS 15.45.170. Before it was repealed in 1998 by Senate Bill (S.B.) 313,[68] AS 15.45.170 was titled "Submission of supplementary petition" and read: "Upon receipt of notice that the filing of the petition was improper, the initiative committee may amend and correct the petition by circulating and filing a supplementary petition within 30 days of the date that notice was given."[69] Medicine Crow argues that "[b]y repealing this statute, the legislature confirmed that sponsors of ballot initiatives can no longer 'amend and correct' their petitions after the statutory deadlines," which means that replacement certifications are not allowed. In support, Medicine Crow quotes the sponsoring senator's statement for the bill: "Simply put, you either got 'em, or you don[]'t!!!"[70]

---

[66] *Id.*

[67] *Id.* (testimony of Laura Glaiser, Dir., Div. of Elections).

[68] S.B. 313, 20th Leg., 2d Sess. (1998).

[69] Former AS 15.45.170 (1997).

[70] Senator Bert Sharp, Sponsor Statement for S.B. 313, 20th Leg., 2d Sess. (1998). As part of another sponsor statement, the senator explained that S.B. 313 sought

Former AS 15.45.170 provided for submission of a supplementary petition only in the event that "the filing of the petition was improper."[71] The propriety of the overall petition itself[72] is based on the number of signatures submitted at the time of filing.[73] Former AS 15.45.170 gave sponsors more time to collect additional signatures after the initial filing and the Division's review period; the elimination of section .170 means sponsors can collect signatures only until the filing deadline. The bill sponsor's comment of "you either got 'em, or you don[]'t" refers to signatures, not certifications. The statute did not comment on corrections to certifications, a procedure that was not even proposed until several years later. Furthermore, to the extent that the repeal of section .170 was meant to reduce delays between filing and certification, it has no relevance for corrections under section .130, which must happen within the 60 days already allowed for the Division's review.[74] The Division correctly interprets section .130 as not allowing the collection of *more* signatures — which would be

---

to eliminate section .170's "30 day extension" because "[t]he flurry of initiatives that we are currently experiencing has resulted in the verification of signatures and thus qualifying for the ballot coming as late as the middle of April resulting in eliminating the possibility of the Legislature being able to react by crafting a similar statute." Senator Bert Sharp, Sponsor Statement for S.B. 313, 20th Leg., 2d Sess. (1998). This statement mischaracterizes the relationship between signature verification and notice to the legislature. We explained in *Yute Air* that "the legislature does not need an initiative petition to be verified before it considers the same subject" and that the petition's filing suffices to give the legislature notice of and opportunity to pass legislation in response. *Yute Air Alaska, Inc. v. McAlpine*, 698 P.2d 1173, 1179 (Alaska 1985).

[71] Former AS 15.45.170 (1997).

[72] *Res. Dev. Council for Alaska, Inc. v. Vote Yes for Alaska's Fair Share*, 494 P.3d 541, 544 (Alaska 2021) ("The signatures collected in the petition booklets are submitted 'as a single instrument' called the petition.").

[73] AS 15.45.160.

[74] *See supra* Part IV.A.1.

contrary to the purpose of former section .170's repeal — but permitting signatures already gathered to count once deficient certifications have been corrected.[75]

In sum, the legislative history leading up to the addition of the "or corrected" clause of AS 15.45.130 supports an interpretation that allows sponsors to correct certifications during the Division's review period.

**B.**     **Allowing Sponsors To Correct Certifications Does Not Conflict With Regulatory Requirements.**

Medicine Crow also contends that the superior court erred by failing to recognize that the Division's actions here violated its own regulations. Medicine Crow bases two arguments on 6 Alaska Administrative Code (AAC) 25.240: that the petition should have been rejected as "patently defective" and that "piecemeal" correction of petitions, as was allowed here, is contrary to the regulation's "single instrument" requirement.

6 AAC 25.240 elaborates on the initiative process defined by statute. It mandates that "[a]ll petition booklets must be filed together as a single instrument, and must be accompanied by a written statement signed by the submitting committee member or the committee's designee acknowledging the number of booklets included in the submission."[76] Further, a "petition that at the time of submission contains on its face an insufficient number of booklets or signed subscriber pages required for

---

[75]     Medicine Crow also argues that another provision, AS 15.45.120, supports her argument that "the Division must treat a filed petition as being in a lockbox" that cannot be changed post-filing. Alaska Statute 15.45.120 effectively provides that subscribers to a petition may withdraw their names "only by giving written notice to the lieutenant governor before the date the petition is filed." This is not instructive for the same reasons that section .170 is not instructive — it focuses on signatures, not circulator certifications. The signatures cannot change once the petition is filed, per section .120, but this has no effect on section .130's regulation of circulator certifications.

[76]     6 AAC 25.240(c).

certification will be determined by the director to have a patent defect."[77]  A petition with a patent defect filed on the deadline for submission "will be certified as insufficient," but a similarly defective petition filed before the deadline "will be declared incomplete and all petition booklets will be returned to the committee or designee for resubmission; the resubmitted petition must be filed by the deadline."[78]

### 1. The petition did not have a "patent defect" requiring the Division to reject it.

Medicine Crow argues that 6 AAC 25.240(f) required the Division to reject the petition and return it to the sponsors for resubmission because it contained a "patent defect."  Under the regulation, a petition has a patent defect if, "at the time of submission," it "contains on its face an insufficient number of booklets or signed subscriber pages required for certification."[79]  According to Medicine Crow, "the 60 booklets that were 'notarized' by someone who was not a notary actually contained a 'patent defect' on the day they were filed."  She contends that when the Division noticed during its full review that the certifications had been improperly certified, the number of signatures was reduced "by a facially[]disqualifying amount" — in other words, the improperly certified signatures were not valid signatures at all, meaning that the petition had had a facially insufficient number of signatures when it was filed and should have been rejected and returned for resubmission.

The superior court agreed with the Division's explanation that, when a petition is filed, "the Division reviews each petition booklet 'on its face' to determine whether there are enough booklets containing enough signatures."  According to the court, that initial review is also "intended to screen out incomplete certification affidavits, such as those with missing dates or locations, or missing certificates."  If the

---

[77]  6 AAC 25.240(f).

[78]  *Id.*

[79]  *Id.*

initial review rules out enough booklets such that the remaining ones "cannot possibly have the requisite number of signatures," the petition has a patent defect. Because under 6 AAC 25.240(f) this initial review happens "at the time of submission," the court ruled that a defect is not patent if it could not have been detected " 'on its face' and 'at the time of submission' " — and because the notarization errors were discovered later, 6 AAC 25.240(f) does not apply.

Medicine Crow argues that requiring a patent defect to be one apparent from the face of the petition is an unworkably subjective standard, because it depends entirely on whether the Division notices a flaw during its initial review. But the court's ruling — that "the Division *could not* have detected the expired notary issue in the 60 booklets 'on its face,' " (emphasis added) — suggests an objective standard.

The superior court's interpretation conflicts to some extent with the regulation's plain language. The regulation says that a patent defect is found when a petition "contains on its face an insufficient *number* of booklets or signed subscriber pages required for certification."[80]  As the Division's handbook explains, the initial review is "a rough count of the signatures . . . to confirm that there are at least enough."[81] The initial review, therefore, does not involve the adequacy of the certifications; the question is only whether the petition *on its face* has enough signatures to meet the

---

[80]    6 AAC 25.240(f) (emphasis added).

[81]    Interpreting the 6 AAC 25.240(f) initial review as a "rough count" is reasonable. We defer to an agency's interpretation of its own regulation "unless its interpretation is plainly erroneous and inconsistent with the regulation." *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014) (internal quotation marks omitted) (quoting *Kuzmin v. State, Com. Fisheries Entry Comm'n*, 223 P.3d 86, 89 (Alaska 2009)).  Medicine Crow argues that the rules of statutory interpretation apply equally to regulations, implying that the deference discussed in *Davis Wright Tremaine* is inapplicable, but the case she cites involved one agency interpreting another agency's regulation, which is not the case here. *See Tea ex rel. A.T.*, 278 P.3d 1262, 1263 (Alaska 2012).

requirements for the initiative to appear on the ballot. Because the sponsors presented enough signature booklets, the Division's regulations allowed it to move on to its actual, more thorough review, during which it discovered the notarization defects in the certifications.

Limiting the 6 AAC 25.240(f) facial review to the number of signatures is logical. Once the deadline has passed, new signatures cannot be collected. That is why 6 AAC 25.240(f) requires that patently defective petitions filed on the deadline be "certified as insufficient," as it would be impossible to correct the deficiency in the number of signatures before the deadline.[82] Patently defective petitions filed *before* the deadline are returned as "incomplete" because there may still be time to collect the necessary number of signatures.[83] While the superior court read "patent defect" in 6 AAC 25.240(f) too expansively, it remains true that Medicine Crow did not identify a patent defect that would have required the Division to reject the petition in order to comply with its regulation.[84]

### 2. The regulatory requirement that petitions be filed as a "single instrument" does not bar correction of certifications for individual signature booklets.

Medicine Crow also relies on 6 AAC 25.240(c), which provides that "[a]ll petition booklets must be filed together as a single instrument, and must be accompanied by a written statement signed by the submitting committee member or the committee's designee acknowledging the number of booklets included in the submission." Medicine Crow contends that the "single instrument" requirement means

---

[82]    6 AAC 25.240(f)(1).

[83]    6 AAC 25.240(f)(2).

[84]    Our reading of 6 AAC 25.240(f) does not mean that the Division may not identify deficiencies during its initial review — such as certification errors — that, while not "patent" as defined in the regulation, nonetheless justify returning booklets for correction and resubmission.

that individual booklets cannot be returned for correction after filing, at least not after the filing deadline. In the Division's interpretation of its regulation, however, the single-instrument requirement is intended only to prevent circulators from submitting their booklets to the Division individually; it has no bearing on whether individual booklets may be returned for correction and refiling.

Nothing in the plain language of 6 AAC 25.240(c) discusses post-filing procedure or explicitly disallows "piecemeal" correction of petition booklets after filing, either before or after the filing deadline has passed. The Division's explanation of the regulation is neither "plainly erroneous [nor] inconsistent with the regulation," and the superior court properly deferred to it.[85] Once a petition has been filed as a single instrument, 6 AAC 25.240(c) does not prevent the Division from allowing corrections on a booklet-by-booklet basis. The superior court correctly determined on summary judgment that the Division's procedure did not violate this regulatory requirement.

## IV. CONCLUSION

The superior court's grant of summary judgment in favor of the Division and the sponsors is AFFIRMED.

---

[85] *Davis Wright Tremaine LLP*, 324 P.3d at 299 (internal quotation marks omitted) (quoting *Kuzmin*, 223 P.3d at 89).